2020 IL App (1st) 180200

FIRST DISTRICT
SIXTH DIVISION
July 24, 2020

No. 1-18-0200

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 16517 |
| | ) | |
| KENNY SCOTT, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice Connors concurred in the judgment and opinion.

## OPINION

¶ 1    Following a jury trial, defendant Kenny Scott was convicted of attempted first degree murder (720 ILCS 5/8-4, 9-1(a)(1) (West 2014)) and armed robbery (*id*. § 18-2(a)(2)). He was sentenced to respective terms of 31 and 21 years' imprisonment, to be served consecutively, based on the court's finding of severe bodily injury (730 ILCS 5/5-8-4 (d)(1) (West 2014)). On appeal, defendant contends that his conviction for armed robbery should be reduced to simple robbery because the State failed to prove beyond a reasonable doubt that he possessed a firearm at the time of the robbery. He also contends that his convictions should be reversed, and he should receive a new trial, because the trial court erred in questioning jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). For the following reasons, we affirm.

¶ 2                                I. JURISDICTION

¶ 3     On February 9, 2017, defendant was convicted after a jury trial. Defendant filed a motion to reconsider, which the trial court denied, and he was sentenced on January 5, 2018. He filed a notice of appeal on January 12, 2018. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from a final judgment of conviction in a criminal case entered below.

¶ 4                                II. BACKGROUND

¶ 5     Prior to trial, the State filed a motion to admit evidence of other crimes, seeking to admit evidence of 10 prior acts of domestic violence against Charmaine Lane, who defendant previously dated, and two prior acts of domestic violence against one of the victims in the present case, Shandel Wilson. The court noted that the incidents the State sought to admit had occurred during a four- to five-year period prior to the present offense. The court found that the probative value of admitting the evidence outweighed the prejudicial effect and granted the State's motion.

¶ 6     During jury selection, the court questioned potential jurors in groups and individually whether they "agree with and accept" the propositions of law required under Rule 431(b). With slight variations, in each instance, the court informed potential jurors that "[t]he State has the burden of proof beyond a reasonable doubt" and then asked whether they "agree with and accept that proposition of law." The court then informed potential jurors in groups and individually that "The defense has no burden. The defendant is presumed innocent. He does not have to testify. He does not have to present witnesses. If he chooses not to testify, you can't hold that against him," and asked whether they "agree with and accept those propositions of law." In one instance, the court informed a potential juror that "The defense has no burden. He's presumed innocent. He

does not have to testify or call witnesses. Assuming he does not testify, you can't hold that against him," and asked, "Do you agree with and accept that proposition of law?"

¶ 7    At trial, Lane testified that defendant is the father of her four-year-old daughter. While they were dating, police were called on separate occasions when defendant "head-butted" Lane in the mouth, requiring a dentist to reposition her teeth; sprayed mace in her eyes; and broke her window with a crowbar, entered her house, and hit her on the leg with the crowbar. Officer Reginald Murray testified that he was working as a school officer at the high school Lane attended in 2010 and observed defendant hit Lane's head on a steel door outside of the school. Defendant was arrested as a result of his actions.

¶ 8    Veronica Morris testified that, on July 5, 2014, her daughter, Wilson, had been dating defendant for about two years. Wilson and her children lived with Morris, along with Morris's goddaughter, Jenail White, White's children, and an uncle. About 11 p.m., on the date in question, Wilson and White were leaving the apartment. Wilson asked Morris to accompany them downstairs because defendant was outside. When the trio walked outside, defendant said he wanted to talk to Wilson and asked her to walk with him. Wilson refused, and along with Morris and White, she went back upstairs. Later, the trio went downstairs, and Morris saw defendant standing directly in front of her, coming into the gate "like he was getting ready to come *** up the stairs." Morris told defendant she would call the police if he did not leave. She took her phone out of her pocket and dialed 911. Defendant "snatched the phone" from Morris and told the operator that they did not need the police and disconnected the call.

¶ 9    Defendant took Morris's cell phone and ran. She chased him but stopped because her daughters were behind her. Morris said, "F*** it, you can keep the phone," and started walking back to her apartment. As she did, she heard Wilson screaming that defendant had a gun. Morris turned and saw that defendant had a gun in his hand and was running towards them. Wilson and

White were closer to the apartment at this time. Morris grabbed defendant around the waist and grabbed his arm as he held the gun. Morris demonstrated for the jury how defendant was holding the gun, in his right hand with his arm extended. She said defendant was pointing the gun at Wilson. Defendant pulled his arm away from Morris and fired the gun three to four times. Then, he took the gun and Morris' phone and ran. Morris started chasing defendant but stopped when Wilson called, "Mom, come back, I'm shot." Wilson was injured in both legs, near her knees. Morris called 911, using a phone belonging to someone who was in the hallway. On a recording of the call, which was admitted into evidence and published to the jury, Morris shouted, "He shot my daughter," repeated the address, and provided a clothing description of the shooter. Police and paramedics arrived, and Wilson was taken to the hospital.

¶ 10   On cross-examination, Morris explained that she did not see defendant with a gun until Wilson yelled that he had a gun as Morris was coming back to her apartment. Morris said defendant was not shooting towards her; he was shooting at Wilson. Morris admitted that she did not like defendant. Three to four days after Wilson got out of the hospital, she and her children went to Tennessee with defendant. A few weeks after they left, Morris contacted authorities in Tennessee.

¶ 11   On redirect, Morris explained that it was "[l]ike maybe five minutes or so" after she chased defendant and began to walk back to her apartment that Wilson screamed that defendant had a gun.

¶ 12   White testified that, on the night in question, she and Wilson were leaving Morris's apartment to go out with their friend, Brianna Lindsey.[1] Wilson asked Morris to come outside with her and White. White saw defendant outside. Defendant said he wanted to talk to Wilson. Morris took out her phone and said she was going to call the police. Defendant "snatched" the phone and "not even a couple minutes after that," Morris said defendant had a gun. White heard three

---

[1]Brianna Lindsey died in a car accident prior to trial.

gunshots and saw that Wilson had been shot in the legs. White could not see Morris or defendant at that time.

¶ 13    Morris took White's phone and called the police. Before the shooting, White had also called 911 and the State published a recording of the call to the jury. On the recording, White gave her name as Ashley and reported a domestic incident between her mother and her friend's boyfriend. She did not respond when the operator asked her whether he had any weapons on him. White explained that, when she spoke to police on the scene, she told them her name was Ashley because she knew both defendant and Wilson and did not want to get involved. White acknowledged that she had been convicted of a narcotics offense and had a pending charge for retail theft at the time of trial.

¶ 14    Wilson testified that she started dating defendant in 2013. On April 3, 2014, defendant hit Wilson in the eye with his fist while they were at a gas station. The police photographed her injuries, which the State presented as evidence. On May 26, 2014, defendant hit Wilson in the mouth, causing a cut.

¶ 15    On July 5, 2014, as Wilson left the apartment, she asked her mother to accompany her downstairs because she believed defendant was outside. Defendant tried to talk to Wilson, and Morris told him "no." Wilson spoke with him, and then she went back upstairs with Morris and White. A while later, they went downstairs again, and defendant was outside, standing inside of the gate to their apartment building. Morris said she was going to call the police and took out her phone. Defendant "snatched" the phone out of her hand and started running. Morris chased him but then abandoned the chase and started heading back to her apartment.

¶ 16    Wilson testified that she was still able to see defendant when he ran up the street with Morris's phone. As defendant and Morris were arguing, Wilson saw defendant holding a gun. Defendant's right arm was extended, and he was pointing the gun at Wilson, who turned and ran

but was shot in both legs. Wilson fell on the steps in the hallway. Defendant was about 15 feet away from Wilson when he shot her.

¶ 17    Police and an ambulance arrived, and Wilson was taken to the hospital. She explained that a bullet went through her right leg. The bullet that entered her left leg was removed during surgery. Wilson was released from the hospital three or four days later. A few days after she was released from the hospital, Wilson took her children to Tennessee where they stayed with defendant until he was arrested there.

¶ 18    Wilson identified People's Exhibit 5 as the gun that defendant shot her with and testified that she had previously seen defendant with that gun.

¶ 19    Paramedic Kevin Farrow treated Wilson at the scene, and when he asked how she was injured, Wilson said that "her boyfriend shot her."

¶ 20    Detective Joseph McCarthy interviewed Wilson at the hospital, and Wilson said her boyfriend, defendant, had shot her. Wilson provided McCarthy with information about where defendant was living, but McCarthy was not able to locate him. McCarthy later learned that defendant was in Tennessee. McCarthy obtained an arrest warrant and traveled to Tennessee.

¶ 21    The parties stipulated that defendant was arrested in Trenton, Tennessee on August 6, 2014.

¶ 22    The parties also stipulated that Dr. Michele Holevar would testify that Wilson arrived at Mount Sinai Hospital with gunshot wounds to both legs. Wilson underwent surgery on both legs, during which a bullet was removed from underneath her left kneecap. The bullet was held for police. Wilson was discharged on July 7, 2014, with medications and crutches, and was instructed to return in one week. It was further stipulated that Chicago police evidence technicians would testify that they recovered the bullet from the hospital and inventoried it, maintaining a proper chain of custody.

¶ 23    Officer Patrick Joyce testified that he received a call of a domestic disturbance at about 11:20 p.m. on July 5, 2014. As he was responding to the call, he learned that a person had been shot. When Joyce arrived, he learned that Wilson had been shot in both legs. Wilson said her mother and boyfriend were involved in an argument and her boyfriend, whom Wilson named as defendant, had shot her twice. Joyce spoke with Brianna Lindsey and Ashley White on the scene. Although Joyce attempted to speak with her, Morris was very emotional and did not want to talk.

¶ 24    On November 11, 2014, Joyce performed a traffic stop. During the stop, a passenger who wished to remain anonymous related that a family member was in possession of a firearm and they wished to turn it in to police. Joyce went to the address that the anonymous passenger had provided and recovered a weapon, which he identified as People's Exhibit 5.

¶ 25    On cross-examination, Joyce explained that he later learned that Ashley White was Jenail White. The traffic stop occurred four months after the shooting and very close to Morris's apartment where the shooting had taken place.

¶ 26    Evidence technician John Buczkiewicz testified that he processed the crime scene, took photographs, and recovered three cartridge cases.

¶ 27    Illinois State Police forensic scientist Brian Zientek received a bullet fragment, three cartridges, and a firearm. He analyzed the evidence and determined that the bullet fragment and the three bullet cartridges were fired from the same firearm. He further determined that the bullet fragment and cartridges were fired from the semiautomatic handgun that Joyce recovered. Wilson identified that same gun as the weapon defendant used to shoot her.

¶ 28    On cross-examination, Zientek stated that, to his knowledge, the firearm was not tested for fingerprints.

7

¶ 29    Illinois State Police forensic scientist Lisa Gilbert received and analyzed the three discharged cartridge cases. There were no latent fingerprints on the cartridges suitable for comparison.

¶ 30    The State rested, and defense counsel moved for a directed verdict on all counts, which the court denied.

¶ 31    The defense recalled Joyce. When Joyce performed the traffic stop on November 9, 2014 and recovered the firearm, he did not have gloves in his vehicle and did not stop at the police station to retrieve gloves. The distance from the traffic stop to where he recovered the gun was about 29 blocks, and a map showing the two locations was admitted into evidence. Joyce inventoried the firearm, checked with the "gun desk" that the firearm had not been reported stolen and was not registered in Chicago, and sent it to forensics. He did not request fingerprint testing on the firearm.

¶ 32    On cross-examination, Joyce explained that the firearm was not recovered from a crime scene and he had no reason to believe it was evidence in this shooting at the time it was turned in to him.

¶ 33    The defense presented a certified copy of Jenail White's 2016 conviction for manufacture and delivery of 15 to 100 grams of heroin. The defense then rested.

¶ 34    Following arguments, the jury deliberated and found defendant guilty of armed robbery. The jury also found defendant guilty of attempted first degree murder of Wilson, finding that he personally discharged a firearm causing great bodily harm to Wilson, and aggravated battery with a firearm of Wilson. The jury found defendant not guilty of attempted first degree murder of Morris and White.

¶ 35    The case was continued for posttrial motions and sentencing. In the interim, defendant was charged with aggravated battery of his trial counsel. The court denied the public defender's motion

to withdraw due to the new charge, explaining that the Public Defender's Office had a conflicts unit for such situations. A new public defender appeared for defendant and requested a fitness evaluation. Following a fitness hearing, the court found defendant fit for sentencing.

¶ 36    After a sentencing hearing, the court sentenced defendant to consecutive terms of 31 years in prison for attempted murder and 21 years in prison for armed robbery. For sentencing purposes, the count of aggravated battery with a firearm merged with the attempted murder conviction. Defense counsel filed a motion to reconsider the court's finding of severe bodily harm. The court denied the motion, finding the State proved severe bodily injury beyond a reasonable doubt and consecutive sentences were therefore proper.

¶ 37                                    III. ANALYSIS

¶ 38    On appeal, defendant first argues this court should reverse his conviction for armed robbery with a firearm because there was no evidence that he was in possession of a firearm when he took Morris's cell phone. Defendant asks this court to reduce his conviction to simple robbery and remand for resentencing.

¶ 39    The standard of review on a challenge to the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). This standard applies to all criminal cases, whether the evidence is direct or circumstantial. *People v. Herring*, 324 Ill. App. 3d 458, 460 (2001). It is up to the trier of fact to determine the witness's credibility, the weight given to their testimony, to resolve conflicts in the evidence, and to draw all reasonable inferences from the evidence. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). All reasonable inferences must be allowed in favor of the State. *People v. White*, 2017 IL App (1st) 142358, ¶ 14. In determining whether an inference is reasonable, the trier of fact need not look for all possible explanations consistent with innocence or " 'be satisfied beyond a

reasonable doubt as to each link in the chain of circumstances.' " *People v. Smith*, 2014 IL App (1st) 123094, ¶ 13 (quoting *Wheeler*, 226 Ill. 2d at 117). Instead, it is sufficient if all of the evidence, taken as a whole, satisfies the trier of fact that the defendant is guilty beyond a reasonable doubt. *Id.* While we will consider all of the evidence, we will not retry the defendant on appeal. See *Wheeler*, 226 Ill. 2d at 117; *People v. Evans*, 209 Ill. 2d 194, 209 (2004). Accordingly, we will not overturn a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory that it raises a reasonable doubt of the defendant's guilt. *People v. Brown*, 2013 IL 114196, ¶ 48; *People v. Lloyd*, 2013 IL 113510, ¶ 42.

¶ 40     A person commits armed robbery when he knowingly takes property by the use of force or threatening the imminent use of force and "carries on or about his or her person or is otherwise armed with a firearm." 720 ILCS 5/18-1(a), 18-2(a)(2) (West 2014). Thus, "the language of the armed robbery statute merely requires the prosecution to show that the accused carried or possessed a dangerous weapon while committing a robbery." *People v. Thomas*, 189 Ill. App. 3d 365, 370 (1989). The statute does not require the State to prove that the firearm be displayed or used. *Id.*; *People v. Addison*, 236 Ill. App. 3d 650, 655 (1992). A conviction for armed robbery may be sustained even where the weapon was not seen or accurately described by the victim. *People v. Elam*, 50 Ill. 2d 214, 220 (1972). However, it is necessary that the offender actually possess a dangerous weapon at the time of the offense. *People v. Fiala*, 85 Ill. App. 3d 397, 400 (1980). The presence of a weapon during commission of a robbery must be established beyond a reasonable doubt to support a conviction for armed robbery and may be established by circumstantial evidence. *People v. Dunivant*, 96 Ill. App. 3d 62, 64 (1981); see *People v. Coleman*, 128 Ill. App. 3d 538, 545 (1984) (some physical manifestation of a weapon is required or some other evidence from which the presence of a weapon may be inferred).

¶ 41    After considering the evidence in the light most favorable to the State, we find that a reasonable trier of fact could conclude that defendant possessed a gun at the time he took Morris's phone from her hand and ran with it. When defendant took Morris's phone and ran up the street, Morris chased after him and Wilson testified that she was still able to see defendant at this time. After what Morris testified was "five minutes or so," and White testified was "not even a couple of minutes," Wilson began screaming that defendant had a gun. Wilson, Morris, and White all testified they saw defendant with a gun. Defendant fired the gun three or four times, hitting Wilson twice, once in each leg. Accordingly, as defendant pulled out a handgun and shot multiple times, hitting Wilson twice, the State presented sufficient evidence that defendant carried a firearm on or about his person at the time he took Morris's phone.

¶ 42    In reaching this conclusion, we find *Fiala*, 85 Ill. App. 3d 397, and *Dunivant*, 96 Ill. App. 3d 62, relied on by defendant, to be distinguishable. In both *Fiala* and *Dunivant*, the victims did not see weapons and the courts found some evidence from which it could have been inferred that the defendants did not carry the weapons on or about their persons during the robberies. See *Fiala*, 85 Ill. App. 3d 397; *Dunivant*, 96 Ill. App. 3d 62. In *Fiala*, the court noted that, although the eyewitnesses believed the defendant was armed, none of them observed a weapon when defendant robbed a grocery store. 85 Ill. App. 3d at 398-99. Within minutes of the robbery, police approached defendant's vehicle and observed him reaching under his seat, possibly for a weapon. *Id.* at 399. Following a high-speed vehicle chase and a foot chase, the defendant was apprehended, and a gun was located in the bushes nearby. *Id.* at 399-400. The court in *Fiala* noted that the officers had observed the defendant reaching in his car, from which it could be inferred that defendant was reaching for a gun after the robbery. *Id.* at 401. Similarly, in *Dunivant*, the victim did not observe any weapons and, although he had a good opportunity to observe the offenders, he did not observe defendant as one of the offenders who was present during the offense. 96 Ill. App. 3d at 62-63.

The defendant in *Dunivant* was arrested in the vehicle with the offenders five to seven minutes after the offense, and a weapon was recovered from where defendant "had been observed to be leaning forward with his hands on the floorboard between his feet." *Id.* at 63.

¶ 43    Contrary to defendant's assertion, in this case there is no evidence that he left and "returned to the scene." Significantly, Wilson testified she was still able to see defendant during the time that he ran up the street with Morris's phone. Defendant relies on Morris's testimony that he pulled out a gun "maybe five minutes or so" after Morris began to walk back to her residence to argue that he had left and returned to the scene, apparently claiming that he could have become armed during this time. Although Morris's and White's testimony varied on how many minutes passed before defendant displayed the firearm, there was no evidence that he had left and returned to the scene. Wilson testified that she was still able to see defendant when he took Morris's phone and ran up the street with it. All three witnesses then saw defendant holding a gun and heard three to four gunshots, two of which hit Wilson. Thus, in contrast to *Fiala* and *Dunivant*, here there was evidence from which the trier of fact could reasonably infer that defendant carried a firearm on or about his person during the robbery. See *Elam*, 50 Ill. 2d 214 (affirming conviction for armed robbery where victim did not see a knife, but believed defendant was armed with a gun, and defendant possessed a knife but not a gun when he was apprehended less than 10 minutes later one and one-half blocks from the scene of the crime, standing on a street corner); *People v. Coleman*, 345 Ill. App. 3d 1029, 1033 (2004) (upholding conviction for armed robbery where victim did not see a weapon and did not know what cut her, but victim was cut during the offense and one of the assailants had indicated she was going to cut her).

¶ 44    Defendant next argues that the trial court failed to comply with Rule 431(b) during jury selection. Defendant concedes that he has forfeited review of this claim by failing to raise it at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (failure to raise an

issue in a written motion for a new trial results in a waiver of that issue on appeal). He nevertheless urges this court to review the issue under the plain error doctrine.

¶ 45    A reviewing court may consider an unpreserved error where a clear or obvious error occurred and one of two circumstances exist: (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Sebby*, 2017 IL 119445, ¶ 48; *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 46    The initial step in a plain error analysis is determining whether a clear or obvious error occurred at trial. *Sebby*, 2017 IL 119445, ¶ 49; *Piatkowski*, 225 Ill. 2d at 565. If so, then under the first prong of plain error we must determine whether defendant has shown "that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *Sebby*, 2017 IL 119445, ¶ 51; *People v. Herron*, 215 Ill. 2d 167, 187 (2005). Prejudice is not presumed under the first prong of plain error, and defendant bears the burden of showing that the error was actually prejudicial or, in other words, that the evidence was closely balanced. *Sebby*, 2017 IL 119445, ¶ 51; *Herron*, 215 Ill. 2d at 193; see *Piatkowski*, 225 Ill. 2d at 566.

¶ 47    Defendant argues that the trial court erred by failing to strictly comply with Illinois Supreme Court Rule 431(b)(3) (eff. July 1, 2012). In *People v. Zehr*, 103 Ill. 2d 472, 477 (1984), our supreme court stated that

> "essential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him."

These principles have been codified in Rule 431(b), which requires that during *voir dire* examination of prospective jurors:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted that State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.
>
> The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 48    In this case, the trial court asked potential jurors individually and in groups whether they "agree with and accept" that the State has the burden of proof beyond a reasonable doubt. The court further asked potential jurors whether they "agree with and accept" that the defense has no burden, defendant is presumed innocent, and he does not have to testify or call witnesses. In one instance, defendant argues that the court informed a potential juror that the defense has no burden, he is presumed innocent, and he does not have to testify or call witnesses but only asked the potential juror "do you agree with and accept" the proposition that defendant's decision not to testify could not be held against him.

¶ 49    Trial courts are required to ask prospective jurors whether they both understand and accept Rule 431(b)'s principles. See *People v. Belknap*, 2014 IL 117094 ¶ 46 (failure to ask whether the prospective jurors understood the rule's principles constituted error alone); *People v. Wilmington*, 2013 IL 112938, ¶ 32 (failure to ask prospective jurors if they understood the rule's principles was

"error in and of itself"). As our supreme court noted in *Wilmington*, it may be arguable that asking jurors whether they disagreed with the Rule 431(b) principles is tantamount to asking them whether they accepted those principles. *Wilmington*, 2013 IL 112938, ¶ 32. However, the trial court's failure to ask whether the jurors understood the principles constitutes error alone. *Id.*

¶ 50 Having determined that a clear and obvious error occurred at trial, we now consider whether the evidence in this case is closely balanced. Plain error under the closely balanced prong "requires a commonsense, contextual analysis of the totality of the evidence." *Belknap*, 2014 IL 117094 ¶ 49.

¶ 51 Evidence may be closely balanced when a case turns on a credibility determination between conflicting testimony. See *Sebby*, 2017 IL 119445, ¶ 63; *People v. Naylor*, 229 Ill. 2d 584, 606-08 (2008) (finding evidence closely balanced where defendant's version of events conflicted with that of testifying officers and both accounts were credible). However, there is no credibility contest where, as here, one party's account is "unrefuted, implausible, or corroborated by other evidence." See *People v. Montgomery*, 2018 IL App (2d) 160541, ¶ 31. Where a case does not involve competing witnesses and the jurors are not asked to determine "relative credibility," the factfinder's responsibility to assess witness credibility does not automatically make the evidence closely balanced. See *People v. Hammonds*, 409 Ill. App. 3d 838, 861-62 (2011).

¶ 52 Nonetheless, defendant argues that the evidence was closely balanced on his conviction for armed robbery because, "None of the State's eyewitnesses testified that [he] used a weapon during the robbery, and it was not until minutes later, after he ran down the block and the witnesses lost sight of him, that he returned to the scene with a gun." As discussed above, contrary to defendant's claim, Wilson testified that she did not lose sight of defendant. We find that where all three eyewitnesses observed defendant with a gun soon after he grabbed the phone and ran away, the evidence was not closely balanced.

¶ 53    Defendant further argues that the evidence on his conviction for attempted murder was closely balanced. Defendant claims that the fact that he shot Wilson in each of her legs, rather than aiming at her head, shows that evidence of his intent to kill was close.

¶ 54    A person commits the offense of attempted first degree murder when he, with intent to commit murder, takes a substantial step towards committing murder. 720 ILCS 5/8-4(a), 9-1(a)(1) (West 2014). Proof of a specific intent to kill is a necessary element of the offense. *People v. Hopp*, 209 Ill. 2d 1, 13 (2004); *People v. Vega*, 2018 IL App (1st) 160619, ¶ 41. However, it "is rarely proven through direct evidence." *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52. The defendant's specific intent to kill may be inferred from the circumstances, including the character of the assault and the use of a deadly weapon. *Id.*; *People v. Anderson*, 108 Ill. App. 3d 563, 566 (1982). "Specific intent to take a human life is a material element of the offense of attempt murder, but the very fact of firing a gun at a person supports the conclusion that the person doing so acted with the intent to kill." *People v. Seats*, 68 Ill. App. 3d 889, 895 (1979); see *Vega*, 2018 IL App (1st) 160619, ¶ 41.

¶ 55    Here, the State presented evidence that defendant pointed a gun at Wilson as he and Morris struggled. Morris testified that defendant extended his right arm around her, aiming at Wilson from a distance of about 15 feet. Defendant fired the gun three to four times, hitting Wilson twice, once in each leg. Proof that the defendant discharged a firearm at Wilson supported the conclusion that he intended to kill her. See *Seats*, 68 Ill. App. 3d at 895; see also *People v. Cloyd*, 152 Ill. App. 3d 50, 54-56 (1987) (evidence of the defendant's intent to kill was not closely balanced, but "blatantly clear" where, although the defendant testified he did not intend to kill the victim, the witnesses testified that the defendant held a gun against the victim's head and fired four times at close range); *People v. Mosley*, 85 Ill. App. 3d 870, 875 (1980) (evidence was "not close factually" and the fact that defendant fired a gun at the victim from a distance of 12 to 15 feet supported the conclusion

that defendant acted with intent to kill). Defendant claims that "the fact that he hit [Wilson] in the legs shows that the issue of intent to kill is close." However, "[p]oor marksmanship is not a defense to attempted murder." *People v. Teague*, 2013 IL App (1st) 110349, ¶ 27; see *Cloyd*, 152 Ill. App. 3d at 55 (stating, "The fact that [the victim] successfully avoided being shot does not make the evidence closer on the question of defendant's specific intent to kill.").

¶ 56    Viewing the evidence in a commonsense manner in the context of the totality of the circumstances, we find that the evidence in this case was not closely balanced. Accordingly, defendant was not prejudiced by the trial court's error in questioning potential jurors, and no plain error occurred.

¶ 57                                    IV. CONCLUSION

¶ 58    For the forgoing reasons, defendant's convictions and sentences are affirmed.

¶ 59    Affirmed.

**No. 1-18-0200**

| | |
|---|---|
| **Cite as:** | *People v. Scott*, 2020 IL App (1st) 180200 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-16517; the Hon. Kenneth J. Wadas, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Carolyn R. Klarquist, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Jon J. Walters, and Paul E. Wojcicki, Assistant State's Attorneys, of counsel), for the People. |