2021 IL App (1st) 191695-U

No. 1-19-1695

Order filed May 19, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 16972 |
| | ) | |
| RONALD BOUYER, | ) | Honorable |
| | ) | Thomas J. Hennelly, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MCBRIDE delivered the judgment of the court.
Presiding Justice Howse and Justice Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's convictions for unlawful use of a weapon by a felon are affirmed over his contention that the State failed to meet its burden to prove he possessed the contraband at issue.

¶ 2    Following a bench trial, defendant Ronald Bouyer was found guilty of four counts of unlawful use or possession of a weapon by a felon (UUWF) and sentenced to four concurrent terms of three years' imprisonment. On appeal, defendant argues, the State failed to prove beyond a

reasonable doubt that he constructively possessed the weapons at issue. For the following reasons, we affirm.

¶ 3 Defendant was charged by indictment with four counts of UUWF, one count of possession with intent to deliver methamphetamine, one count of violation of the Firearm Owner's Identification Card Act, and one count of possession of cannabis with intent to deliver. The State proceeded to trial on the UUWF and possession with intent to deliver methamphetamine counts. The four UUWF counts alleged that, on or about September 27, 2018, defendant knowingly possessed in his own abode a .38-caliber revolver, a .40-caliber semiautomatic handgun, .38-caliber ammunition, and .40-caliber ammunition, after having been previously convicted of the felony offense of UUWF (720 ILCS 5/24-1.1(a) (West 2018)). The possession with intent to deliver methamphetamine count alleged that, on or about September 27, 2018, defendant unlawfully and knowingly possessed with intent to deliver less than 5 grams of methamphetamine or a substance containing methamphetamine (720 ILCS 646/55(a)(1), (2)(A) (West 2018)).

¶ 4 Former Chicago police officer John Pudowski testified that around 7 p.m. on September 27, 2018, while working as a Chicago police officer, he executed a search warrant at an apartment on the 2300 block of East 70th Place, along with Chicago police officers Kozlowski and Brown. Upon entering the apartment, Pudowski observed defendant in a bed in a bedroom, where he just woke up. No one else was in the apartment. Defendant was wearing underwear. The officers allowed him to put on pants, then detained him as they conducted a systematic search of the apartment. Pudowski stood close to defendant while Kozlowski removed a floorboard in the living room. Brown and Sergeant Boyle[1] were also present. While Kozlowski searched underneath the

---

[1] Boyle's first name does not appear in the report of proceedings.

floorboards, defendant "uttered that there were only two guns down there and nothing else." Weapons and narcotics were recovered in the apartment.

¶ 5    Pudowski moved defendant to the kitchen and "Mirandize[d]" him in the presence of Boyle. Defendant agreed to speak to the officers and "stated that he only had the guns for protection because he had gotten shot before and that they were in the location they were because he didn't want his son to get a hold of it." Pudowski performed a pat-down of defendant, recovering keys to the apartment building. Pudowski confirmed that the keys opened the apartment door.

¶ 6    From the kitchen counter, Pudowski recovered mail labeled "Peoples Gas" addressed to defendant at the apartment. Pudowski identified photographs of the "gas bills" he recovered. The officers brought defendant to the police station to be processed.

¶ 7    On cross-examination, Pudowski testified that he did not open the gas bills to see the date on them. Defense counsel then opened the bills in court. After viewing the bills in court, Pudowski stated they were dated July 21, 2015, and July 31, 2015, which was three years prior to the date of the search. When asked if Pudowski found any proof of residency within two years of the warrant, Pudowski testified, "Just that he told me he lived there." Pudowski was not wearing a body-worn camera on the date of the search. Pudowski identified defendant's "valid" Illinois identification card that listed an address on the 800 block of East 71st Street.

¶ 8    Pudowski recalled seeing children's clothing in a dining room area, but could not recall whether it belonged to a boy or girl. He could not recall whether children's toys were in the apartment, or if defendant's name was on the apartment's buzzer. Pudowski testified that surveillance was conducted on the apartment before the execution of the search warrant. No individuals entered the building during that time, but a woman, who the officers did not speak to,

left at one point. Two firearms were found under a floorboard and, without removing the floorboards, the firearms were not visible.

¶ 9    Officer Matthew Kozlowski testified that when he searched the living room, he noticed that a floorboard was discolored from the rest of the floorboards. He examined the discolored floorboard by stepping and walking on it. Kozlowski then stuck a knife between the discolored floorboard and an adjoining floorboard, "[a]t which time it was loose and easily popped up." Kozlowski recovered a Smith and Wesson Model 36 revolver from underneath the floorboard. The revolver was a .38 Special loaded with four live rounds. From the same compartment, Kozlowski also recovered an unloaded Smith and Wesson SD40 and, next to it, a magazine loaded with live .40-caliber rounds. Kozlowski testified that the magazine would fit the recovered Smith and Wesson SD40.

¶ 10    On cross-examination, Kozlowski testified that defendant was detained approximately 10 to 12 feet from where the firearms were recovered, but Kozlowski did not hear defendant say anything while Kozlowski investigated the floorboards. Kozlowski did not know if the firearms were checked for fingerprints or DNA evidence.

¶ 11    Officer Daniel Brown testified that upon entering the apartment, defendant was in bed in a bedroom in his underwear and appeared to have just woken up. Defendant dressed in pants that were in the bedroom and was led to the living room. Brown then searched the "immediate area where [defendant] was sitting on the bed" and "went through the entire bedroom." He recovered "a clear knotted bag containing eight smaller bags and each containing a pill," and a small "bundle" of United States currency on a television stand "in plain sight," and another bundle of United States currency on the bed. The bed defendant was sleeping in was one to two feet from the television

stand. On cross-examination, Brown testified that he could not recall whether there were women's clothes in the bedroom closet, or whether any pictures were taken of the bedroom closet.

¶ 12    The State entered two stipulations. The first stipulation provided that defendant had a prior conviction for UUWF. The second stipulation provided that, if called, a forensic scientist would testify that one of the recovered pills tested positive for methamphetamine.

¶ 13    The State also entered several exhibits, including photographs of the bedroom in which defendant was sleeping, the discolored floorboard, the weapons recovered under the floor, the keys to the apartment found on defendant, and the bills addressed to defendant at the apartment.

¶ 14    Defendant testified that in September of 2018, he lived on the 800 block of 71st Street, and identified his Illinois identification card as accurately indicating his address at that time. Around 5 p.m. on September 27, 2018, defendant went to an apartment on the 2300 block of 70th Place with Jeannette Rush, his on-and-off girlfriend. Rush lived in the apartment and defendant had previously been there "a few times." Defendant believed that, at that time, Rush's former boyfriend lived with her, but Rush's name was the only name on the apartment's buzzer. No children lived there. When Rush left the apartment around 6:30 p.m., defendant took a nap.

¶ 15    Defendant awoke to a "loud boom" and went to the front door. Police then kicked in the front door, detained defendant, and searched the apartment. Defendant testified the officers "destroyed" the apartment and recovered marijuana and a "pill" from in front of the television in his room, but "[t]hat was there already." The officers continuously asked defendant what was there, but defendant did not know anything.

¶ 16    One officer walked to the back of the house, got on his cellphone, and when he returned, went "directly to the floor." The officer used a knife to pry open the floorboard, where he recovered

a firearm. Officers then retrieved a large tool and "tore the floor up," finding another firearm. Defendant denied telling police that the firearms were his, testifying that he "was just as shocked as them."

¶ 17    On cross-examination, defendant testified he was in an on-and-off relationship with Rush for four or five years. He denied ever living at her apartment, but he helped her pay the bills "[a] few times." Defendant testified that he has four children, but does not have any with Rush. Defendant admitted he felt comfortable to get in the bed, take off his clothes, and go to sleep. The keys defendant had were ones Rush had left him in case he wanted to leave while she was out. Defendant denied that the keys were in his pants pocket, stating that they were sitting on the "front room table."

¶ 18    Defense counsel entered a photograph of defendant's Illinois identification card, which lists an address on the 800 block of 71st Street.

¶ 19    The trial court acquitted defendant of possession with intent to deliver methamphetamine, finding that while there was evidence that defendant "was in the vicinity of where the narcotics were recovered," there was not "any proof that he resided there other than the fact that he was on again and off again with *** Rush." The court continued, "Other than that, I don't think there's been a nexus sufficient beyond a reasonable doubt to establish that he possessed the amphetamines at the time in the apartment and so there will be a finding of not guilty as to that count."

¶ 20    The trial court found defendant guilty on all counts of UUWF. In ruling, the court stated:

"as to the remaining counts, ***, it's a different standard here and that standard is as to whether or not I believe the testimony of *** Officer Pudowski, a veteran police officer ***. He testified clearly and convincingly that after fully advising the defendant of Miranda

that the defendant admitted that the guns were his and that he possessed them and he possessed them because he had been shot before and that he had kept them under the floorboards because he didn't want his children which he acknowledges he has at some point to have them. Now, I realize that he doesn't reside there *** but it certainly seems that he frequents the area and it certainly seems that he and Ms. Rush, at the time, had some sort of a relationship that allowed him to come and go at that apartment. He was comfortable enough to take a nap in the middle of the day or later in the day and so for all those reasons – I'm just deposing the testimony of a veteran police officer against the testimony of a convicted felon and I believe that Officer Pudowski told a correct recitation of what Mr. Bouyer said after he was fully advised of his Miranda and, for all those reasons, there will be a finding of guilty as to Counts 1 through 4 and judgment on the finding."

¶ 21    Defendant filed a motion to reconsider, or in the alternative, for a new trial. At the hearing on defendant's motion, defense counsel argued that the "residency evidence" was insufficient, and the court noted that it "kind of agree[d]," which is why it acquitted defendant of the drug charge. Defense counsel then argued that defendant's confession to police was insufficient to prove his guilt beyond a reasonable doubt because the statement was "unrecorded" as the officers were not wearing body-worn cameras. The State responded that it was the court's responsibility to assess credibility. The court held:

"I remember the case very well, and it really came down to credibility. And, as I indicated, I didn't think the State proved him guilty of the narcotics aspect of the case, but I did believe the officer. I found him to be credible. And for all those reasons, there's nothing in your motion that would cause me to disturb that finding.

So I believe he said what he said to the officer. I'm not going to disturb my finding.

So your motion to reconsider or new trial, in the alternative, is considered but is, respectfully, denied."

¶ 22   Following a hearing, the trial court stated the counts merged, but then sentenced defendant to three years' imprisonment on each count, to be served concurrently.[2] The court denied defendant's motion to reconsider sentence.

¶ 23   Defendant argues on appeal that the State failed to prove him guilty of UUWF beyond a reasonable doubt as it failed to prove that he constructively possessed the weapons found in Rush's apartment. He points out the only proof of residency was gas bills from three years prior to the search, and there was no camera footage to corroborate any alleged incriminating statements he made.

¶ 24   A person may not be convicted in state court without proof beyond a reasonable doubt of every fact necessary to constitute the crime for which he is charged. *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 16. On a challenge to the sufficiency of the evidence for a conviction, the standard of review is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Davison*, 233 Ill. 2d 30, 43 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is the trier of fact's responsibility to determine witness credibility, weigh the evidence and resolve conflicts within it, and to draw all reasonable inferences from the evidence. *People v. Scott*, 2020 IL App (1st) 180200, ¶ 39. All reasonable inferences are allowed in favor of the State, and in determining

---

[2] The mittimus reflects the four concurrent sentences.

whether an inference is reasonable, the trier of fact need not seek out "all possible explanations consistent with innocence." *Id.* We do not retry the defendant. *Id.* Thus, "we will not overturn a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory that it raises a reasonable doubt of the defendant's guilt." *Id.*

¶ 25 To sustain a conviction for UUWF, the State was required to prove that defendant "knowingly possess[ed] on or about his person or on his land or in his own abode or fixed place of business *** any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction." 720 ILCS 5/24-1.1(a) (West 2018). Defendant challenges only the knowing possession element of the offense. He contends that the State failed to prove beyond a reasonable doubt that he had constructive possession of the "weapons," *i.e.*, the firearms and ammunition, recovered from under the floorboard of the apartment in which he was found.

¶ 26 Where the defendant was not found in actual possession of a firearm or ammunition, the State must prove the defendant constructively possessed them. *People v. Sams*, 2013 IL App (1st) 121431, ¶ 10. Constructive possession is proved where the defendant had (1) knowledge of the presence of the contraband, and (2) immediate and exclusive control over the area where the contraband was found. *Id.* Knowledge may be inferred from surrounding circumstances, including the defendant's actions, declarations, or other conduct, which indicate that he knew of the contraband's presence in the place it was found. *Id.*

¶ 27 Control, on the other hand, is shown where the defendant had the " 'intent and capability to maintain control and dominion' " over the contraband, "even if he lacks personal present dominion over it." *Spencer*, 2012 IL App (1st) 102094, ¶ 17 (quoting *People v. Frieberg*, 147 Ill.

2d 326, 361 (1992)). "Generally, habitation of the location where contraband is found is sufficient evidence of control constituting constructive possession." *People v. Terrell*, 2017 IL App (1st) 142726, ¶ 19. "Evidence of residency or habitation often takes the form of rent receipts, utility bills, or mail." *People v. Fernandez*, 2016 IL App (1st) 141667, ¶ 19.

¶ 28    In this case, the evidence presented at trial established defendant's constructive possession of the two firearms and corresponding ammunition found underneath a floorboard. Defendant's statements to police demonstrate his knowledge that these weapons were present. While Kozlowski was still prying up the discolored living room floorboard, defendant told Pudowski that there were "only two guns down there and nothing else." His statement was corroborated when Kozlowski then recovered a loaded firearm and a second firearm with corresponding ammunition under the floorboard. After the weapons were recovered and defendant was read the *Miranda* warnings, he told the officers he "only had the guns for protection because he had gotten shot before and that they were in the location they were because he didn't want his son to get a hold of it." Thus defendant acknowledged the weapons under the living room floor were his. They were well-hidden from view and children's clothing was seen in the apartment, supporting defendant's statement that he hid his weapons under the floor in order to protect his son from contact with those weapons.

¶ 29    Defendant's immediate and exclusive control over the weapons is shown by the fact that he was in the apartment alone, felt comfortable enough to sleep there in his underwear, and had a key to the apartment. He told Pudowski he lived in the apartment, bills addressed to him were found in the apartment, and he knew the weapons were underneath the floor even before Kozlowski found them, later admitting he had hidden them there. See *Spencer*, 2012 IL App (1st) 102094, ¶

18 (noting that defendant's statements to police regarding the recovered contraband "linked" him to it). Viewing all the evidence in the light most favorable to the State, we find that a rational trier of fact could have found that defendant constructively possessed the recovered weapons, and thus, that the State met its burden to prove the essential elements of UUWF beyond a reasonable doubt.

¶ 30    Still, defendant argues the trial court's guilty findings on the UUWF counts were inconsistent with its acquittal on the drug charge because the court found insufficient evidence of residency to support the drug charge. We disagree that the findings are inconsistent. In acquitting defendant of the drug charge, the court did note that there was not "any proof" that defendant resided in the apartment. However, in finding defendant guilty of UUWF, the court also expressly recognized the lack of proof of defendant's residency. Its findings that defendant possessed the firearm were premised on defendant frequenting the apartment based on his relationship with Rush, the fact that he felt comfortable enough to nap there in the middle of the day, and Pudowski's testimony that defendant admitted the weapons were his; they were not premised on his residency. Defendant denied making the statements, but the court stated it believed Pudowski's testimony that defendant admitted that the weapons were his. The testimony of a single witness, if positive and credible, is sufficient to convict (*People v. Gray*, 2017 IL 120958, ¶ 36), and we defer to the court's credibility determination (see *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007)).

¶ 31    Defendant contests the credibility of Pudowski's testimony, emphasizing the fact that his statements were not recorded by body camera footage or in reports. He argues defendant's children did not live with Rush and she was not their mother, which contradicted what defendant allegedly said to Pudowski about keeping the firearms out of his son's reach. He also argues there is no

physical evidence corroborating defendant's statements as the weapons were not checked for fingerprints or DNA evidence.

¶ 32    We reiterate that it is the trier of fact's duty to determine witness credibility. *Scott*, 2020 IL App (1st) 180200, ¶ 39. As such, we will not reverse a conviction where a defendant merely asserts that a witness is not credible. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60. The trial court found Pudowski's testimony to be credible, and we must defer to that determination. See *Wheeler*, 226 Ill. 2d at 114-15. Further, defendant's initial statement was corroborated when, after he told Pudowski there were two firearms under the floor, Kozlowski then recovered two firearms from under the floor. Defendant's second statement that he hid the weapons under the floor to keep them from his son was corroborated by the fact that children's clothes were found in the apartment. Because defendant's statements established his knowledge and control over the recovered weapons, the State proved he constructively possessed them as required for a UUWF conviction. See *Spencer*, 2012 IL App (1st) 102094, ¶ 17.

¶ 33    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 34    Affirmed.