2020 IL App (1st) 171874-U

No. 1-17-1874

Order filed September 30, 2020

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 11 CR 7415 |
| | ) | |
| OSVALDO COLUNGA, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Gregory Robert Ginex, |
| | ) | Judge presiding. |

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Howse and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1     *Held*:  We affirm defendant's convictions where there was sufficient evidence to support his attempted murder conviction, the trial court did not abuse its discretion in limiting evidence of the victim's violent character, the State did not improperly question or comment on defendant's post-arrest silence, defendant was not entitled to an instruction on imperfect self-defense, and the trial court did not abuse its discretion in sentencing defendant. However, we remand on the issue of presentence custody credit.

¶ 2    Following a jury trial, defendant Osvaldo Colunga was found guilty of attempted murder, aggravated battery with a firearm, and unlawful use of a weapon by a felon. After the trial court merged his conviction for aggravated battery with a firearm into his conviction for attempted murder, the court sentenced him to 35 years' imprisonment for attempted murder and 4 years' imprisonment for unlawful use of a weapon by a felon, to be served concurrently. On appeal, defendant contends that: (1) there was insufficient evidence to support his attempted murder conviction; (2) the trial court unconstitutionally infringed on his ability to present a defense in limiting his evidence of the victim's violent character; (3) the State violated his right to remain silent following arrest in highlighting and commenting on his failure to assert his claim of self-defense to police; (4) the State's closing arguments denied defendant a fair trial by misstating the law, exploiting defendant's post-arrest silence, criticizing defendant's exercise of his right to a trial, and mischaracterizing his theory of self-defense; (5) his counsel provided deficient representation in failing to request an instruction on imperfect self-defense; (6) his sentence should be reduced due to insufficient evidence that the victim suffered permanent disfigurement and the trial court failed to consider mitigating factors; (7) his mittimus should be amended to reflect the correct number of days of presentence custody credit. For the reasons that follow, we affirm his convictions but remand to the circuit court to allow defendant to pursue his issue regarding presentence custody credit.

¶ 3                                    I. BACKGROUND

¶ 4    In case number 11 CR 7415, a grand jury indicted defendant with multiple counts of attempted murder, aggravated battery with a firearm, and aggravated discharge of a firearm, all in connection with the shooting of Alfonso Delatorre on April 15, 2011. Defendant was also charged in case number 11 CR 7416 with multiple counts of unlawful use of a weapon by a felon. His two

cases were joined prior to trial, and the State proceeded to trial against him in case number 11 CR 7415 on only Counts 6 and 7. Count 6 alleged that defendant committed attempted murder in that he, without lawful justification and with the intent to kill, shot Alfonso while armed with a firearm, and, during the commission of the offense, defendant personally discharged a firearm that proximately caused permanent disfigurement to Alfonso.[1] Count 7 alleged that defendant committed aggravated battery with a firearm in that he, while committing a battery, knowingly or intentionally caused any injury to Alfonso by means of discharging a firearm. In case number 11 CR 7416, the State proceeded to trial against defendant on only Count 1, but that count is not relevant to this appeal.

¶ 5        In defendant's answer to discovery, he asserted that he might raise self-defense at trial. Pursuant to this defense, defendant filed a motion to introduce evidence of prior bad acts committed by Alfonso pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984); in particular, evidence that Alfonso shot him in the stomach on June 1, 2010. To support his motion, defendant attached a police report from June 1, 2010, written by Officer Genaro Manzo of the Melrose Park Police Department. In the report, Officer Manzo stated that he spoke with Uriel Garcia, who recounted that he and defendant were sitting in front of his house when a Ford Bronco drove up, its occupants yelled something and then one passenger began shooting, which resulted in defendant and Garcia being shot. Garcia stated that the shooter was known as "Fonzie," who he "believed" to be Alfonso. Behind the Ford Bronco, according to Garcia, was a Cadillac, which was occupied by Anthony Delatorre, Alfonso's brother, and Paolo Gennell. Officer Manzo noted in his report that he was

---

[1] Because Alfonso's brother, Anthony Delatorre, is also involved in this case, we will refer to each by their first name.

unable to interview defendant, who was unresponsive upon reaching the hospital. The court provisionally granted defendant's motion, but noted that it would revisit the issue during trial.

¶ 6                                 A. The State's Case

¶ 7     The evidence in the State's case showed that Alfonso and Anthony knew defendant and pinpointed defendant as a member of the Latin Kings street gang. Both Alfonso and Anthony denied being members of the gang themselves; however, they acknowledged making statements to the police that they were members of the Latin Kings and used to "gang bang" with defendant. During trial, Alfonso also acknowledged that, in June 2010, the police investigated him as a suspect in the shooting of defendant, but Alfonso denied shooting him and he was never charged with the crime.

¶ 8     Anthony testified that on the afternoon of April 15, 2011, he drove his white Buick to a house in Melrose Park to pick up Alfonso. Anthony's girlfriend, Arianna Nardella, was sitting in the front seat, their three-year-old son was in a car seat in the middle of the rear row, and Anthony and Alfonso's four-year-old godson was sitting in a car seat behind Nardella. Alfonso entered the vehicle and sat behind Anthony. They drove to a gas station, and Anthony went inside for about three minutes to get something to drink while everyone else stayed in the car. Once Anthony returned, he drove toward a house of Alfonso's friend located on the 1300 block of 19th Avenue in Melrose Park. After arriving, Anthony pulled over and parked in a parking space on the side of the street.

¶ 9     After they had been sitting there for only a few seconds, Alfonso heard a loud pop, felt a burning sensation in his left forearm and then saw he was bleeding. He testified that he felt a searing pain and observed a bullet hole in his arm. Alfonso identified photographs of the bullet hole in his arm that were admitted into evidence at trial. Alfonso testified that after the gunshot,

he looked at the children to make sure they were not hurt, then looked out the car window and observed defendant with a firearm in his hand hanging out of a vehicle.

¶ 10    Anthony also heard a loud pop, and when he looked out his window, he observed defendant, holding a firearm outside of a car window. Nardella likewise heard a loud pop, looked out the driver's side window and observed defendant halfway out of the window holding a gun in his hand. At trial, Alfonso, Anthony and Nardella denied that anyone in their vehicle had a gun.

¶ 11    After defendant's vehicle left the scene, Anthony drove to a nearby 7-Eleven where he observed Melrose Park Police Officer Vito Migliore, who called paramedics. Officer Migliore saw that Alfonso was bleeding from a hole in his left forearm. Officer Mark Loochtan, an evidence technician who responded to the scene, testified that a bullet fragment was lodged inside Alfonso's jacket, and was able to extract the fragment. The paramedics arrived soon thereafter and transported Alfonso to the hospital. Meanwhile, Officer Loochtan relocated to the 1300 block of 19th Avenue, where he observed a shell casing on the street and collected it.

¶ 12    At the hospital, Melrose Park Police Detective Sam Chiappetta talked to Alfonso about the shooting. Detective Chiappetta knew Alfonso was a member of the Latin Kings street gang and had multiple interactions with him previously. Alfonso informed Detective Chiappetta that "BoBo" had shot him. Detective Chiappetta knew BoBo was defendant, and with this information, Detective Chiappetta conducted surveillance on defendant's residence. Detective Chiappetta eventually observed defendant enter the front passenger seat of a vehicle with two other people and drive away from his house. Detective Chiappetta pulled the vehicle over. As Detective Chiappetta approached the vehicle, he observed defendant make a furtive movement toward the glove box and slam it shut. Detective Chiappetta and his partner drew their weapons, ordered everyone out of the vehicle and defendant was placed into custody. When Detective Chiappetta

searched the vehicle, he found a semi-automatic handgun in the glove box with one live round in the chamber and six rounds in a magazine.

¶ 13   Alfonso was treated and released from the hospital shortly after being admitted. Later that night, police officers came to Nardella's residence and had her view a photo array, where she identified defendant as the shooter. The following day, Nardella, Anthony and Alfonso went to the police station. Each separately viewed a lineup, and each identified defendant as the shooter. Both Anthony and Alfonso told Melrose Park Police Detective Jeff Juan that they knew defendant because all three of them were Latin Kings.

¶ 14   At the conclusion of its case, the State entered into evidence a certified copy of conviction showing that defendant had previously been convicted of aggravated robbery.

¶ 15                                    B. The Defense's Case

¶ 16   In the defense's case, defendant and his brother, Manuel Colunga, testified. Defendant testified that he had been a member of the Latin Kings since he was about 15 years old. In the spring of 2008, when defendant was 19 years old, he had a child and tried to leave the gang because of the child, but the gang would not let him leave. By the spring of 2010, defendant had been admitted into a community college, and he no longer had time to "hang around with the Latin Kings." The Latin Kings made him choose either college or the gang, but told him that "they were going to kill [him] if [he] picked college." Defendant testified that in spite of this threat, he chose not to associate with the gang any longer.

¶ 17   According to defendant, on June 1, 2010, defendant was hanging out with friends on Uriel Garcia's porch. While there, two vehicles full of Latin Kings from defendant's neighborhood, including Anthony and Alfonso, drove up to Garcia's house. Anthony screamed at defendant and told him to come to the car, but because defendant saw Alfonso with a firearm, he stayed on

Garcia's porch. Anthony and Alfonso began asking defendant questions, but because he was scared, he did not respond. Suddenly, Alfonso began shooting his firearm. One of the bullets hit defendant in his stomach. Defendant was hospitalized for over a month. Afterward, defendant bought a firearm with a hair-pinned trigger from a friend for $200 to use as protection from the Latin Kings. Though defendant did not have a Firearm Owner's Identification Card nor a concealed carry license, he carried the weapon with him most of the time because he lived in Latin King territory. He acknowledged that guns can cause injuries and kill people. Additionally, the parties stipulated that, if Manzo were called to testify, he would have stated that, on June 1, 2010, he investigated a shooting and observed that defendant had been shot in the abdomen.[2]

¶ 18    On the late afternoon of April 15, 2011, Manuel picked up defendant from his girlfriend's house in Franklin Park. Another brother of defendant's, Alexander, also went with Manuel. Defendant sat in the back passenger seat and Alexander sat in front of him. On the way back to their house in Melrose Park, another brother called and asked if Manuel could pick up something to drink, so Manuel drove to a gas station in Melrose Park. Alexander got out of the car and went into the gas station's convenience store.

---

[2] When the trial court revisited defendant's *Lynch* motion during trial, the court allowed defendant to testify about the June 1, 2010, incident. After defendant testified, defense counsel requested that Officer Manzo be allowed to testify about the incident, *i.e.*, that he observed that defendant had been shot on June 1, 2010, that defendant had obvious injuries to his abdomen from the gunshots, and that Uriel Garcia identified the shooter as Alfonso. The court ruled that it would allow Manzo's testimony that he observed that defendant had been shot and he observed the injuries, but he could not testify about the identification of the shooter. The trial court indicated that the problem was that defendant never identified the shooter, someone else did, and the proposed evidence was raising "a lot of collateral issues." The trial court found that testimony that someone else identified Alfonso as the shooter was "beyond what we need to do" and irrelevant. Defense counsel and the State then reached a stipulation regarding Manzo's testimony. Defense counsel also requested that he be allowed to call Garcia, who would testify that he was present when defendant was shot and Alfonso was the shooter, but the trial court denied this request for the same reason.

¶ 19    While Manuel and defendant were sitting in the vehicle, defendant observed two vehicles with members of the Latin Kings inside. In one of vehicles, there were two Latin Kings and one individual defendant did not know. In the second vehicle, a white Buick, defendant noticed Anthony and Alfonso. Seeing them concerned defendant because of what had occurred in June 2010. Defendant alerted Manuel to the situation and told Manuel to leave immediately, even without Alexander. Manuel testified that defendant pointed out a group of people at the gas station and stated that those were people he "has problems with" and told Manuel to "get out as fast as I can." But Manuel did not want to leave Alexander, who soon returned to the car.

¶ 20    Manuel then drove away from the gas station. Manuel evaded one car, a silver Isuzu Trooper, but he ended up behind the other car, the white Buick with Alfonso and Anthony inside. Manuel and defendant testified that they were stuck in slow-moving rush hour traffic and it was also raining. Defendant raised his head a bit and told Manuel that they were right behind the vehicle he wanted to get away from. Defendant testified that he pulled his gun out and held it on his lap when he observed they were right behind the Buick because he "was terrified." The Buick then pulled over into the parking lane. Defendant testified that he was "ready" to shoot his gun in case Alfonso tried to shoot him again and because he was "not going to let my little brothers get shot like I got shot." He testified that he was defending himself and his brothers. Defendant testified that he did not observe that there were any children in the white Buick.

¶ 21    Manuel testified that as he drove up next to the white Buick, one of its windows lowered. Manuel testified that someone in the Buick—he believed it was the driver—pulled out a firearm and pointed it at his vehicle. Manuel stepped on his brakes and then heard a gunshot. After he heard the gunshot, he maneuvered in between two cars and into the parking lane and then quickly drove away. Manuel testified that he observed the white Buick following him and so he accelerated

and "blew through" several stop signs. The Buick followed for about four blocks and then ceased following them.

¶ 22    According to defendant, the white Buick had suddenly turned into the parking lane as if the driver had lost control of the car. Defendant testified that one window was rolled down and he observed Alfonso's arm "was out the window and he had a blue semiautomatic, and he was pointing it at my little brother." Defendant testified that when he saw this, defendant "put my hand out my window and I shot" one time. Manuel then maneuvered into oncoming traffic and "got us out of there, and [Alfonso] was chasing us." Defendant testified that he was in fear for his life because he had previously been shot by Alfonso and Alfonso had a firearm.

¶ 23    Manuel then drove to their father's house, where they remained until later that night, when defendant asked Manuel to drive him to his girlfriend's house. They did not contact the police because when defendant had been shot in June 2010, the police did not help him. On the way to his girlfriend's house, the police stopped them and defendant was arrested.

¶ 24    After the incident, the police interviewed defendant and Manuel. Defendant acknowledged during cross-examination that he spoke with Melrose Park police investigators after he was arrested. He denied telling them that he never left his house on the night of the incident, that he spent the entire night high on marijuana, or that none of the Latin Kings knew his real name. He did not tell police that he had a gun. When asked if he told police that he was justified in shooting Alfonso, defendant responded, "No. *** I remained [*sic*] my right to remain silent."

¶ 25    Manuel testified that he was kept at the police station for about three days. He provided a statement, which the police transcribed. Manuel testified that the statement indicated it was taken on April 16, 2011, at 8:32 p.m. He read the statement and conceded that nowhere in it did it state that someone in the white Buick pointed a gun out of the window. Manuel signed the statement

and initialed corrections, but he testified that the police omitted things that he told them, threatened to charge him as an accomplice and beat him, and did not give him any food. He was 18 years old at the time. Manuel conceded that his transcribed statement did not include any details about someone in a white Buick pointing a gun at his vehicle, though he asserted that he told the police this information.

¶ 26                                    C. The State's Rebuttal

¶ 27    In the State's rebuttal case, Melrose Park Police Detective Giovincent Espinosa testified that he interviewed Manuel on April 16, 2011, and before asking him questions, he advised Manuel of his *Miranda* rights because Manuel was viewed as a possible suspect. Manuel indicated to Detective Espinosa that understood his rights, agreed to talk, and signed a *Miranda* waiver form. Detective Espinosa memorialized Manuel's oral statement. He denied that he added things that Manuel did not state or refused to add things that Manuel said. Manuel reviewed the statement, made some corrections, and signed both pages of the two-page document, which was dated April 16, 2011, at 4:29 p.m. Detective Espinosa denied that he or anyone else in his presence threatened Manuel, that he refused to give Manuel food, or that Manuel was kept at the police station for days. Detective Espinosa acknowledged that Manuel told him that defendant alerted Manuel to people being present at a gas station with whom he was having issues. Espinosa testified that nowhere in the statement does Manuel indicate that Manuel observed an individual from the white Buick point a gun at him.

¶ 28    Melrose Park Police Sergeant Michael Scudiero testified that he and a partner informed defendant of his *Miranda* rights after he had been arrested around 11:30 p.m. on April 15, 2011. Defendant told Sergeant Scudiero that he understood his rights, signed a *Miranda* waiver form at 1:30 a.m. (on April 16, 2011), and agreed to speak. However, Sergeant Scudiero did not

immediately have a conversation with defendant. Later on April 16th, defendant, Sergeant Scudiero, and his partner were again in an interview room together. Sergeant Scudiero once again informed defendant of his *Miranda* rights. Defendant again stated he understood his rights, signed another *Miranda* waiver form, and agreed to speak. Sergeant Scudiero asked defendant where he was the previous night, and defendant stated that he never left the house, he watched movies, and ingested marijuana. Defendant never told Sergeant Scudiero that he was at a gas station, that he observed two vehicles full of Latin Kings, that he was afraid of the Latin Kings, that he had a firearm, that Alfonso had a firearm outside of the window, that defendant shot into the white Buick, or that he was protecting his brothers. Sergeant Scudiero did not memorialize defendant's statement in writing. Scudiero recorded what defendant told him in his case notes.

¶ 29                                    D. Closing Arguments

¶ 30    Regarding the charge of attempted murder, the State argued in closing that defendant took several substantial steps toward the commission of killing Alfonso, including arming himself with a loaded firearm as he left his house on April 15, 2011, having the weapon on his lap as his brother drove behind the white Buick, pointing the weapon at Alfonso, and ultimately pulling the trigger. In arguing that defendant had the intent to kill Alfonso, the State asserted that defendant's actions showed his intent to kill Alfonso because firearms are dangerous and "guns kill people"; the State asserted that "[w]hen someone shoots at another human being, they are shooting to kill." In positing that defendant did not have lawful justification to shoot Alfonso, the State remarked that defendant was not justified in carrying the gun outside his house, holding it on his lap, or in shooting at Alfonso. The State asserted that the evidence showed that defendant personally discharged the firearm in that he knowingly and intentionally fired the firearm, and that this caused permanent disfigurement in that the bullet "blew a hole in Alfonso Delatorre's arm." The State

further observed that "defendant did not take responsibility when he spoke to the police," "didn't take responsibility with that bogus lawful justification argument," and "did not take responsibility for any of his actions on April 15, 2011." The State asked the jury to make defendant responsible for his actions that day and find him guilty.

¶ 31     In the defense's closing argument, defense counsel urged that the only issue in dispute was whether defendant was justified in firing his weapon toward Alfonso. Counsel argued that, based on Alfonso previously shooting defendant and Alfonso's actions on April 15, 2011, in pointing a firearm outside his vehicle, defendant was in reasonable fear for his life that necessitated the use of his own firearm. Counsel highlighted that defendant only shot his firearm once, positing that this was evidence of self-defense rather than an intent to kill. Counsel argued that Alfonso was lying about not having a gun on April 15, as Alfonso had lied about not being a Latin King or knowing defendant because he was covering up the fact that the Latin Kings wanted to kill defendant. Counsel argued that the white Buick would not have chased Manuel's car after the gunshot if no one in the Buick had been armed. Counsel asserted that Manuel gave a credible account but omitted mention of anyone in the Buick being armed in his written statement because he was interrogated by police for hours and was only 18 years old at the time and was threatened. Counsel argued that unlike Alfonso and Anthony, defendant was candid about his prior gang affiliation and the fact that he carried a gun for protection and that he shot the gun one time to protect himself and his brothers. Although the State asserted that defendant told the police that he was home all day on the day of the shooting, counsel asserted that defendant actually asserted his right to remain silent and he was the only one who did not have a written statement and the police had done nothing for him when he was shot previously.

¶ 32    In rebuttal, the State contended that the law does not allow defendant to carry a loaded weapon for 10 months after he was shot so he can be ready to shoot the person he believed shot him, as this was not lawful justification or self-defense, but retaliation and "not taking responsibility for your actions." The State asserted that defendant's testimony was a "spin of lies" and he did not take responsibility for his actions when he spoke to the police or when he testified and it was the jury's "opportunity to take responsibility to find the defendant guilty, guilty for his actions on April 15, 2011."

¶ 33                                D. Verdicts and Posttrial

¶ 34    Following argument, the jury found defendant guilty of attempted murder and found that, during the commission of the offense, defendant was: (1) armed with a firearm; (2) personally discharged a firearm; and (3) proximately caused permanent disfigurement to Alfonso. The jury also found defendant guilty of aggravated battery with a firearm and unlawful possession of a weapon by a felon.

¶ 35    Defendant unsuccessfully filed a motion for new trial and his case proceeded to sentencing. Defendant's presentence investigative report revealed that, when defendant committed the offenses, he had just turned 20 years old. Defendant reported that his childhood was great until his mother passed away when he was 10 years old. He was later expelled from high school and convicted of aggravated robbery and domestic battery. The report further revealed that, in 2013, defendant was diagnosed with bipolar disorder and schizophrenia, resulting in a brief hospital stay and then treatment in a mental health center for one month. He then received outpatient mental health treatment. Defendant had taken Lithium, Seroquel and Olanzapine at various times for his treatment. At the time of the report, defendant had a girlfriend of three years with whom he had one child, and two children from a previous relationship.

¶ 36    At the sentencing hearing, in aggravation, the State argued that the evidence showed defendant shot into a car with two small children present without any provocation and that there was no evidence that defendant suffered from schizophrenia at the time of the shooting. The State presented two victim impact statements from Alfonso and Nardella and noted defendant's criminal history.

¶ 37    In mitigation, defense counsel highlighted defendant's mental health conditions. Defendant testified about his mental health conditions and noted that he was not taking any medication at the time of the shooting. Although defense counsel conceded the evidence of his mental health issues were from two years after the shooting, counsel argued that schizophrenia "is not something that just pops up on you" and that defendant had the mental health condition long before his actual date of diagnosis, and therefore defendant acted "under the sudden passion" and "reacted mistakenly to what he perceived as a threat to his life" on April 15, 2011. Counsel therefore requested that defendant be sentenced to a Class 1 felony instead of a Class X felony.

¶ 38    The trial court had a lengthy discussion with defense counsel about defendant's mental health issues, but ultimately observed that all of the records relied upon by counsel were from "two years after the incident." As such, the court found it speculative that defendant was suffering from a mental condition in April 2011. The trial court further found that based on the evidence, no one in the white Buick had a gun. The court concluded that defendant failed to sufficiently prove he was acting under a sudden and intense passion resulting from serious provocation. The court therefore determined that it would sentence defendant for attempted murder as a Class X offense. The court then merged defendant's conviction for aggravated battery with a firearm into his conviction for attempted murder and sentenced defendant to 35 years' imprisonment for attempt first-degree murder, with 10 years as the base sentence and a 25-year enhancement for personally

discharging a firearm that proximately caused permanent disfigurement to Alfonso. The court also sentenced defendant to four years' imprisonment on his conviction for unlawful use of a weapon by a felon, which was to be served concurrently to his sentence for attempt first-degree murder.

¶ 39    Defendant subsequently appealed.

¶ 40                                    II. ANALYSIS

¶ 41                          A. Sufficiency of the Evidence

¶ 42    On appeal, defendant first argues that there was insufficient evidence to prove beyond a reasonable doubt that he had the specific intent to kill Alfonso. Defendant contends that the mere fact that he shot the gun once at Alfonso does not automatically prove intent to kill, and other evidence showed he lacked such specific intent. Defendant emphasizes that he only shot the gun one time despite it being loaded with six bullets, that he aimed at the middle of the car door and not Alfonso's head, and that the cars were not moving at the time and thus defendant had ample opportunity to shoot multiple rounds at close range, but did not. Defendant emphasizes that, as further evidence of his lack of intent, he did not make any specific threats to kill Alfonso and the wound inflicted was not life-threatening.

¶ 43    In reviewing a challenge to the sufficiency of the evidence supporting a conviction, we must view the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). We draw all reasonable inferences in favor of the State. *People v. White*, 2017 IL App (1st) 142358, ¶ 14. We also defer to the trier of fact to determine a witness's credibility, what weight to give the evidence, how to resolve conflicts in the evidence, and what inferences to draw from the evidence. *People v. Scott*, 2020 IL App (1st) 180200, ¶ 39 (citing *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001)). As

such, "we will not overturn a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory that it raises a reasonable doubt of the defendant's guilt." *Id.*

¶ 44    For the crime of attempted murder, "the State must prove beyond a reasonable doubt that the defendant, with specific intent to commit murder, did any act that constituted a substantial step toward the commission of murder." *In re T.G.*, 285 Ill. App. 3d 838, 843 (1996).

¶ 45    Defendant challenges the element of specific intent. A defendant's intent to kill may be inferred from "the character of the defendant's acts and the circumstances surrounding the commission of the offense [citation], including the character of the assault, the nature and seriousness of the injury [citation], and the use of a deadly weapon [citation]." *In re T.G.*, 285 Ill. App. 3d at 843. Intent may be inferred from "the firing of a gun at or towards another person with either malice or a total disregard for human life." (Internal quotation marks omitted.) *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001). "However, evidence that the defendant fired a gun, coupled with nothing more, is generally not sufficient to prove a specific intent to kill." *Id.* The trier of fact may infer a specific intent to kill if surrounding circumstances demonstrate that defendant "intended the willfully committed act, 'the direct and natural tendency of which is to destroy another's life.' " *Id.* (quoting *People v. Migliore,* 170 Ill. App. 3d 581, 586 (1988)). Indeed, " '[t]he very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill.' " *Id.* (quoting *People v. Thorns*, 62 Ill. App. 3d 1028, 1031 (1978)).

¶ 46    Here, when viewing the evidence in the light most favorable to the State, we find that ample evidence established that defendant fired the gun at Alfonso with the intent to kill. The testimony showed that defendant knew Alfonso was in the Buick in front of him. There was an existing feud between Alfonso and defendant based on the prior shooting. Defendant drew his firearm from his pocket in anticipation of using it. The undisputed testimony indicated that when the Buick pulled

over to the parking lane and Manuel's car drove near it, defendant stuck his firearm out of the window, aimed it at the Buick, and fired into the Buick. Defendant admitted that he knew guns could cause injuries and kill someone, that he had his weapon out and was ready to use it, and that his firearm had a "hairpin" trigger. The bullet penetrated the car door and struck Alfonso in the arm, and defendant's car then sped away.

¶ 47    Although defendant claimed that Alfonso also had aimed a weapon out of the window of the Buick, this claim was contradicted by three other witnesses – Nardella, Alfonso, and Anthony. When Manuel spoke to the police shortly after the shooting, he did not state that Alfonso or any other occupant of the Buick aimed a firearm out of the vehicle. Manuel then contradicted this at trial. Moreover, the police found no weapon in the Buick shortly after the shooting occurred. Additionally, Alfonso was struck in his forearm and the bullet lodged in his sleeve, a scenario which is improbable if his arm had been extended out of the window and aiming a gun at the time. As noted, we must make all reasonable inferences in favor of the prosecution and defer to the jury's assessment of the credibility of the witnesses. "It is the function of the trier of fact to determine the existence of the requisite intent, and that determination will not be disturbed on review unless it clearly appears there exists a reasonable doubt as to the defendant's guilt." (Internal quotation marks omitted). *People v. Green*, 339 Ill. App. 3d 443, 451 (2003).

¶ 48    Defendant argues that his lack of intent was shown by the fact that he only fired one shot, he aimed at the car door, and he had ample time to take further shots and fire more bullets but did not do so. However, our court has previously determined that firing a gun at a vehicle occupied by people constitutes attempt to commit murder because the obvious natural tendency of firing upon occupied vehicles is destruction of the occupants' lives. *People v. Garcia*, 407 Ill. App. 3d 195, 201-02 (2011) (finding that the intent to kill can be "inferred from the act of firing two bullets in

the direction of an occupied car and a crowded street."). Despite defendant's argument on appeal, there was no testimony or evidence that defendant specifically aimed down at the car door instead of directly at Alfonso. Our courts have repeatedly held that, where a defendant fails to strike an individual, *i.e.*, demonstrated poor marksmanship, this does not vitiate an intent to kill or amount to a defense—it was the province of the jury to determine whether a defendant lacked intent to kill or was simply a bad shot. "Poor marksmanship is not a defense to attempted murder, and it is a question of fact for the jury to determine whether defendant lacked the intent to kill or whether defendant was simply unskilled with his weapon and missed his targets." *People v. Teague*, 2013 IL App (1st) 110349, ¶ 27 (finding evidence that defendant fired assault rifle at police officers from 40 feet away sufficient to show intent to kill officers even if defendant failed to strike them; poor marksmanship was not defense to attempted murder). See *Green*, 339 Ill. App. 3d at 451-52 (firing four to five times at an unmarked police car from a moving vehicle and fleeing were sufficient to show intent to kill even though the defendant missed them at close range; although the facts could reasonably support the opposite inference that the defendant lacked the intent to kill when he failed to strike the officers, the trier of fact decides which competing inference to draw); *Ephraim*, 323 Ill. App. 3d at 1110-11 (sufficient evidence for jury to reasonably infer an intent to kill from defendant's chase of a rival gang member's car while firing shots at it after he was ordered to do so by a fellow gang member).

¶ 49    It is not the function of this court to retry defendant on appeal or substitute our judgment for that of the trier of fact. *Scott*, 2020 IL App (1st) 180200, ¶ 39. Defendant was free to argue his alternative explanations to the jury. We defer to the trier of fact's determinations regarding the credibility of the witnesses and resolution of conflicting inferences to be drawn from the evidence. *Id.* As in *Teague* and *Green*, the jury was free to reject defendant's arguments; the decision as to

which competing inference to draw from the evidence belonged to the trier of fact. Considering the trial evidence here, it was not unreasonable for the jury to conclude that defendant fired at Alfonso with the intent to kill or cause great bodily harm.

¶ 50    Defendant analogizes his case to *People v. Mitchell*, 105 Ill. 2d 1, 9-10 (1984), and *People v. Thomas*, 127 Ill. App. 2d 444, 446-47 (1970), to support his contention that the State failed to prove his intent to kill because defendant did not kill Alfonso despite having ample opportunity to do so. In *Mitchell*, the supreme court found insufficient evidence of intent to kill where the defendant beat her infant child with her hand and a belt multiple times over two days, but when the child lost consciousness, the mother placed a cool cloth over her head and took her to the hospital. *Mitchell*, 105 Ill. 2d at 9-10. In *Thomas*, 127 Ill. App. 2d at 455-56, the court *sua sponte* reversed the defendant's conviction for attempted murder because this conviction and his aggravated battery conviction resulted from the same conduct and "the opportunity for murder was such that there was insufficient proof that defendant intended or attempted to commit that crime" where, over the course of 45 minutes, he stabbed the victim in the shoulder, beat her and threatened her, raped her, robbed her, and then fled. We find both of these cases distinguishable. Each involved prolonged contact with the victims during which time the defendants had complete dominion and control over them, but either took actions inconsistent with an intent to kill, and/or did not use their weapons in a manner calculated to inflict fatal injury. In contrast, defendant's confrontation with Alfonso was extremely brief, he had no dominion or control over him, and quickly took advantage of the short span of time by aiming and firing his gun toward Alfonso before fleeing.

¶ 51    Although defendant asserts that he made no verbal threat to kill Alfonso and did not inflict a life-threatening injury, we observe that the State was not required to present medical evidence of

a nearly fatal injury to prove attempted murder. Rather, the State need only show that the defendant intended to kill and took a substantial step towards that end. *In re T.G.*, 285 Ill. App. 3d at 843. The jury was fully aware of alleged infirmities of the State's case as asserted by defense counsel in closing argument, and we will not substitute our judgment for that of the jury. We do not find the evidence so unreasonable or improbable that it raises a reasonable doubt as to defendant's guilt. *Scott*, 2020 IL App (1st) 180200, ¶ 39.

¶ 52                                B. *People v. Lynch* Evidence

¶ 53     Defendant next contends that the trial court improperly limited his ability to present evidence of Alfonso's violent character under *People v. Lynch*, 104 Ill. 2d 194 (1984), to support defendant's claim of self-defense, and this violated his constitutional right to present a defense. Defendant contends that he offered this evidence under both prongs of *Lynch* to show his knowledge of Alfonso's violent tendencies and to show that Alfonso was the initial aggressor. The trial court allowed defendant to testify that Alfonso shot him on June 1, 2010, and that Alfonso was the first one to pull a gun on April 15, 2011. However, the trial court erred in not allowing defendant to present the evidence of Garcia, who would have testified that Alfonso also shot him during the June 1, 2010, incident, and Officer Manzo's testimony that Garcia identified the shooter as Alfonso. This prevented defendant from providing corroborating evidence. As defendant preserved this issue for appeal, the State cannot show that it was harmless beyond a reasonable doubt because the case essentially amounted to a credibility contest between the State's witnesses and defendant.

¶ 54     Defendant contends that we should employ a *de novo* standard of review of his claim that his constitutional right to present a defense was improperly curtailed. However, "when a party claims he was denied the constitutional right to present a complete defense due to improper

evidentiary rulings, the standard of review is abuse of discretion." *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 133. Evidentiary rulings fall within the sound discretion of the trial court and we will not reverse such rulings unless the court abuses that discretion. *People v. Reid*, 179 Ill. 2d 297, 313 (1997). An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 55 Here, defendant raised a claim of self-defense, an affirmative defense that the State bears the burden of disproving beyond a reasonable doubt. *People v. Lee*, 213 Ill. 2d 218, 224-25 (2004).

¶ 56 Pursuant to *Lynch*, "where a theory of self-defense is raised, evidence of a victim's violent or aggressive character is relevant (1) to show that the defendant's knowledge of the victim's behavior and tendencies affected the defendant's perceptions of and reactions to the victim's actions, and (2) to support the defendant's version of events where there are conflicting accounts." *People v. Morgan*, 197 Ill. 2d 404, 454 (2001) (citing *Lynch*, 104 Ill. 2d at 199-201). See also Ill. R. Evid. 405(b)(2) (eff. Jan. 1, 2011) ("In criminal homicide or battery cases when the accused raises the theory of self-defense and there is conflicting evidence as to whether the alleged victim was the aggressor, proof may also be made of specific instances of the alleged victim's prior violent conduct."). "Under the first approach, *Lynch* material is relevant and admissible only if the defendant knew of the victim's violent acts that he seeks to introduce." *People v. Figueroa*, 381 Ill. App. 3d 828, 844 (2008).

¶ 57 Evidence proffered under *Lynch* must also be relevant, that is, it tends to make the existence of any consequential fact either more or less probable than it would be without the evidence. *Illgen,* 145 Ill. 2d at 365-66. Such evidence may be excluded where its probative value substantially outweighs the danger of unfair prejudice, risks confusing or misleading the jury, or

raises concerns about undue delay or presenting cumulative evidence. *People v. Martinez*, 2019 IL App (2d) 170793, ¶ 9 (citing Ill. R. Evid. 403 (eff. Jan. 1, 2011)).

¶ 58    Here, the trial court allowed defendant to testify as to both types of *Lynch* evidence. That is, defendant testified that he was aware of Alfonso's violent tendencies because Alfonso previously shot defendant on June 1, 2010. And, defendant testified that on April 15, 2011, Alfonso was the initial aggressor because Alfonso was the first to pull a gun and defendant shot at him in self-defense. Defendant also offed the stipulated testimony of Officer Manzo that he investigated a shooting on June 1, 2010, and observed that defendant had been shot in the abdomen.

¶ 59    Defendant's contentions regarding the excluded evidence relate to the first type of *Lynch* evidence, that is, evidence of Alfonso's violent or aggressive character "to show that the defendant's knowledge of the victim's behavior and tendencies affected the defendant's perceptions of and reactions to the victim's actions." *Morgan*, 197 Ill. 2d at 454.  The trial court prohibited defendant from presenting the testimony of Garcia and limited the testimony of Officer Manzo. According to Manzo's police report, Garcia recounted to Manzo that he and defendant were sitting in front of his house on June 1, 2010, when a Ford Bronco drove up, its occupants yelled something and then one passenger began shooting, which resulted in defendant and Garcia being shot in the stomach. Garcia identified Alfonso as the shooter. The trial court held that Officer Manzo could testify that he observed that defendant had been shot and observed his injuries, but he could not testify that Garcia identified the shooter as Alfonso. The trial court stated that the problem was that defendant never identified the shooter and the proposed evidence raised "a lot of collateral issues." The trial court found that testimony that someone else identified Alfonso as the shooter was "beyond what we need to do" and irrelevant. The trial court denied the request to present Garcia's testimony for the same reason.

¶ 60    We find the trial court did not abuse its discretion in excluding testimony related to the June 1, 2010, shooting incident. Manzo's proposed testimony that Garcia identified the shooter as Alfonso would have constituted hearsay. Generally, hearsay evidence which is "an out-of-court statement offered to prove the truth of the matter asserted," is inadmissible "unless it falls within an exception to the hearsay rule," because of its lack of reliability and the inability of the opposing party to confront the declarant. (Internal quotation marks omitted). *People v. Caffey,* 205 Ill. 2d 52, 88 (2001). Our courts have found no abuse of discretion in excluding hearsay evidence even when offered under *Lynch*. For example, in *People v. Simon*, 2011 IL App (1st) 091197, ¶¶ 71-74, the court did not abuse its discretion in excluding proposed *Lynch* evidence as hearsay where the witness would have testified to out-of-court statements that were being used to prove that the victim had shot the defendant. As this court has stated, "a prior altercation or an arrest, without a conviction, can be adequate proof of violent character when supported by *firsthand* testimony as to the victim's behavior." (Emphasis added). *People v. Cook*, 352 Ill. App. 3d 108, 128 (2004). See *People v. Huddleston,* 176 Ill. App. 3d 18, 28 (1988) (the victim could testify that the decedent had struck her under *Lynch*, but a police officer who had not personally observed the incident could not).

¶ 61    Here, Manzo did not witness the June 2010 shooting and had no first-hand knowledge regarding whether Alfonso was the shooter. His knowledge came from investigating the case and interviewing Garcia, who identified the shooter. Defendant did not identify Alfonso as the shooter. The trial court did not abuse its discretion in limiting Manzo's testimony to only what he observed, that is, that he investigated a shooting and observed that defendant had been shot in the abdomen.

¶ 62    Defendant claims that Garcia's testimony would have demonstrated to the jury Alfonso's violent tendencies by showing that there were two shootings. However, Garcia's testimony did not

indicate there was a separate, second shooting. Rather, his proposed testimony indicated that he also happened to be shot, along with defendant, during the same June 2010 shooting incident where Alfonso pulled up to Garcia's house, yelled at defendant, and began firing multiple shots. That they were shot contemporaneously during the same shooting incident would not have added additional evidence with respect to Alfonso's violent tendencies beyond what defendant had already testified to. A trial court is permitted to exclude *Lynch* evidence where it is cumulative to other evidence. A trial court has discretion to exclude proffered *Lynch* evidence where "other factors involved indicate a lack of reliable foundation for this evidence" such as whether it is cumulative, too general or indefinite, or too remote in time. *Figueroa*, 381 Ill. App. 3d at 846-47. See *People v. Nunn,* 357 Ill. App. 3d 625, 632 (2005) (no abuse of discretion to exclude *Lynch* evidence where it was cumulative of other evidence). Here, the trial court determined that allowing the defense to present this testimony would raise collateral issues and was "beyond what we needed to do" given that defendant had failed to identify the shooter. We cannot say that this ruling was so arbitrary or fanciful as to constitute an abuse of discretion as defendant's proposed evidence relating what Garcia observed and knew would fail to demonstrate how "*defendant's* knowledge of the victim's behavior and tendencies affected defendant's perceptions and reactions to the victim's actions." (Emphasis added). *Morgan*, 197 Ill. 2d at 454.

¶ 63    Defendant relies on *People v. Hanson*, 138 Ill. App. 3d 530 (1985), in asserting that the defendant there was allowed to present several witnesses to corroborate his *Lynch* evidence, and defendant thus should have been allowed to present his two witnesses here. However, we find *Hanson* distinguishable. In that case, the defendant's proposed witnesses would have testified to two prior incidents where the victim pulled a knife and threatened them, and that defendant knew of those prior acts. *Id.* at 536-38. The only evidence of the victim's violent character up until that

point had come from the victim himself, who presented a different version of the incidents and admitted to pleading guilty to assault charges in connection therewith. *Id.* at 538. Due to this disparity, the court found the defendant was prejudiced by exclusion of these other witnesses' testimony. *Id.* Contrary to defendant's argument, the *Hanson* court was not concerned with the number of witnesses the defendant wished to present, but, rather, the type of evidence they provided in light of the other evidence presented at trial. In contrast, here, Manzo would have only been able to present hearsay testimony about the prior shooting incident, not a first-hand account.

¶ 64    Moreover, exclusion of some of defendant's *Lynch* evidence did not affect the outcome in light of the fact that there were three eyewitnesses—Alfonso, Nardella, and Anthony—who testified that defendant was the aggressor and drew his gun and shot first during the April 15, 2011 incident. Defendant's own statements following the incident omitted mention of any self-defense claim, and Manuel presented contradictory statements at trial and to officers after the shooting as to whether he saw a gun being pointed from the white vehicle. Moreover, no gun was recovered from Alfonso or his vehicle and the location where he was shot on his arm suggests that his arm was not outside his window at the time he was shot.

¶ 65                          C. Defendant's Post-Arrest Silence

¶ 66    Defendant next argues that the State improperly highlighted his post-arrest silence when, during the State's rebuttal case, it elicited testimony from a detective that defendant did not offer his self-defense claim when questioned after his arrest, and then argued in closing that defendant fabricated his claim of self-defense to fit the evidence. Defendant asserts that this constituted both plain error and ineffective assistance of trial counsel in failing to object to the State's questions and arguments.

¶ 67    Defendant did not object at trial or include this issue in a posttrial motion; he has therefore not preserved it for appellate review. *People v. Enoch,* 122 Ill. 2d 176, 186 (1988). Under the plain-error doctrine, a reviewing court will overlook a forfeiture where a clear, obvious error occurred and either (1) the evidence was closely balanced, or (2) the error was so grave that it impacted the fairness of the trial and denigrated the integrity of the judicial process. *People v. Sebby*, 2017 IL 119445, ¶¶ 48-49.

¶ 68    Defendant also maintains that his trial counsel rendered constitutionally defective assistance in failing to object and properly preserve this issue for appeal. A defendant has a constitutional right to the effective assistance of counsel. *People v. Banks*, 2016 IL App (1st) 131009, ¶ 123 (citing U.S. Const. amends VI, XIV; Ill. Const. 1970, art. 1, § 8). To establish ineffective assistance of counsel, a defendant must prove that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) he suffered prejudice as a result. *Banks*, 2016 IL App (1st) 131009, ¶ 123 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). That is, defendant must demonstrate that he was prejudiced by the deficient performance in that a reasonable probability exists that the outcome of the proceeding would have been different. *Id.* A defendant must satisfy both prongs of the *Strickland* test to prevail on such a claim. *Id.*

¶ 69    "Under *Doyle v. Ohio,* 426 U.S. 610, 619 (1976), it is error to comment on a defendant's post-arrest silence or his request for counsel." *Banks*, 2016 IL App (1st) 131009, ¶ 132. "[A]fter a defendant has received his *Miranda* warnings, it is a due process violation for a prosecutor to comment on a defendant's postarrest silence at trial for the purpose of impeaching the defendant's testimony." *People v. Adams,* 2012 IL 111168, ¶ 28. However, the court recognizes two exceptions to this rule. "A defendant's postarrest silence may be used for impeachment

purposes when the defendant testifies at trial that he gave an exculpatory statement to the police when arrested or if the defendant made a prior inconsistent statement to the police after his arrest." *People v. Simmons*, 293 Ill. App. 3d 806, 811 (1998).

¶ 70 In the present case, defendant testified in his case-in-chief that on the evening of April 16, 2011, his brother picked him up from his girlfriend's house, they went to a gas station and observed some Latin Kings. Defendant and his brothers left, but found themselves stuck in traffic while behind the white Buick. Defendant testified that he saw Alfonso point a gun at him and his brother, and so defendant shot his gun at the other vehicle and they then drove to his father's house. On cross-examination, defendant conceded that he spoke with investigators following his arrest, but he denied telling them that he never left his house on the night of the incident, that he spent the entire night high on marijuana, or that none of the Latin Kings knew his real name. He did not tell police that he had a gun. When asked if he told police that he was justified in shooting Alfonso, defendant responded, "No. *** I remained [*sic*] my right to remain silent."

¶ 71 In turn, the State then presented the rebuttal testimony of Scudiero, who testified that defendant was twice informed of his *Miranda* rights after arrest, defendant indicated that he understood his rights, he signed the *Miranda* waiver forms, and agreed to speak with the police both times. Defendant then proceeded to tell Scudiero that on the night in question he never left the house, he watched movies, and "got f*** up on weed." Scudiero took notes but did not memorialize his statement in writing. Defendant never told Scudiero that he was at a gas station, that he observed two vehicles occupied by Latin Kings, that he was afraid of the Latin Kings, that he had a firearm, that Alfonso had a firearm outside of the window, that defendant shot into the white Buick, or that he was protecting his brothers.

¶ 72 Based on the testimony presented, we find that no *Doyle* violation occurred here. The State did not improperly present evidence of defendant's post-arrest statements or impermissibly comment on a defendant's post-arrest silence at trial for the purpose of impeaching the defendant's trial testimony. Rather, defendant testified to a version of events on April 15, 2011, that was inconsistent with his statements to investigators following his arrest (that he stayed in all evening and ingested marijuana). Defendant then denied making such post-arrest statements to police, and maintained that he had invoked his right to remain silent. This also contradicted evidence that following his arrest, defendant was twice informed of his right to remain silent and agreed to speak with investigators and signed the *Miranda* waiver of rights form twice. The rule in *Doyle* "applies only when a defendant invokes his right to remain silent." (Internal quotation marks omitted.) *Banks*, 2016 IL App (1st) 131009, ¶ 132. "In Illinois, once a defendant makes a post-*Miranda* oral statement, the introduction of evidence that the defendant subsequently refused to memorialize that statement does not necessarily violate the fifth amendment or conflict with the *Doyle* opinion." *Id.* For example, in *People v. Christiansen,* 116 Ill. 2d 96, 120 (1987), the court held that where the defendant failed to remain silent after being informed of his rights and instead made oral statements, he had relinquished his fifth amendment rights and could not claim that testimony indicating he was unwilling to subsequently memorialize his oral statements violated his right to remain silent. Similarly, in *People v. Adams*, 2012 IL 111168, ¶¶ 28-29, the court found no *Doyle* violation occurred where the prosecutor commented on how the defendant "had two and a half years to come up with his story" where the defendant received his *Miranda* warnings and remained silent after arrest, but testified at trial regarding his version of events, as the prosecutor's comments related to the defendant's credibility as a witness and his opportunity to observe the trial and perfect his account.

¶ 73    Here, State did not run afoul of *Doyle* in its cross-examination of defendant or in presenting Scudiero's rebuttal testimony. The State properly exercised its ability to impeach a witness on cross-examination with a prior inconsistent statement where the witness denies making the statement when the State can prove that statement with extrinsic evidence. *People v. Williams*, 204 Ill. 2d 191, 211 (2003). Defendant's alleged partial post arrest silence was subject to impeachment because defendant made a prior inconsistent statement to the police following his arrest and *Miranda* warnings. *Simmons,* 293 Ill. App. 3d at 811. Defendant's statement to Scudiero that he did not leave the house and was home all night on April 15, 2011, watching movies and ingesting marijuana was not merely a "less detailed" account, as defendant claims. Rather, it was entirely inconsistent with his trial testimony that his brother picked him up from his girlfriend's house, they went to a gas station where they observed Latin Kings in another vehicle, defendant had a gun and placed it on his lap as they left the gas station and found themselves behind the Buick with Latin Kings, and that he saw Alfonso point a gun and defendant shot into the Buick before his brother sped away through traffic.

¶ 74    Although defendant relies on *People v. Timmons*, 114 Ill. App. 3d 861, 866-67 (1983), in asserting that there was no manifest inconsistency between his statements to police and partial post-arrest silence and his trial testimony, we find *Timmons* distinguishable. In that case, the defendant testified that he did not deliver drugs on the date in question and testified about his various activities that day and denied that a particular individual stopped by the house; the court found that this testimony was not manifestly inconsistent with the defendant's statements to the police post-arrest—that he denied committing the offense of delivering drugs and denied any involvement with that individual. *Id.* It was therefore error for the State to question the defendant

on cross-examination about his failure to talk with police about his whereabouts or activities on that date as it did not constitute impeachment. *Id.*

¶ 75    Here, in contrast, defendant specifically waived his *Miranda* rights twice after his arrest and agreed to speak with police. He informed police about his activities and whereabouts on the evening of April 15, 2011. This version of events conflicted with his subsequent trial testimony. Even if, as defendant claims, he only related to police what he did "that night," the two versions were still inconsistent as defendant told police that he stayed in all night, but defendant testified that he had his brother drive him to his girlfriend's house (and he was arrested on the way). The trial evidence indicated that the offense did not occur during the day, but rather, sometime after 4 p.m. We find that defendant's trial testimony and his post-arrest statements to police were manifestly inconsistent and a proper area of impeachment by the State. Defendant has not established that any plain, obvious error occurred. *Sebby*, 2017 IL 119445, ¶¶ 48-49.

¶ 76    Because we have concluded that no error occurred, we similarly reject defendant's claim that his trial counsel rendered ineffective assistance in failing to object and properly preserve his claims of error. *Banks*, 2016 IL App (1st) 131009, ¶ 123; *Strickland*, 466 U.S. at 687 (a defendant must satisfy both prongs of the *Strickland* test to prevail on a claim of ineffective assistance).

¶ 77    In a related vein, defendant argues that the State exacerbated the *Doyle* violation by arguing in closing that defendant fabricated his theory of self-defense to fit the evidence, which encouraged the jury to hold his failure to assert his defense during police interrogation against him. However, we will address this issue in section D, *infra*, in the context of defendant's challenge to other claims of prosecutorial error in closing arguments.

¶ 78                    D. Prosecutorial Misconduct in Closing Arguments

¶ 79     In his next claim of error, defendant asserts that the State denied him a fair trial due to several objectionable statements during closing arguments. Defendant did not preserve his claims of prosecutorial misconduct by objecting at trial and raising his claims in a posttrial motion, and he has therefore forfeited them. *People v. Guerrero*, 2020 IL App (1st) 172156, ¶ 14 (citing *Sebby*, 2017 IL 119445, ¶ 48). Accordingly, we review these claims under the plain error doctrine, under which, as stated, defendant must show that a plain, clear, or obvious error occurred and that either the evidence was closely balanced or the error was so serious as to affect the fairness of the trial. *Id.* (citing *Sebby*, 2017 IL 119445, ¶ 48). The first step in this analysis is to determine whether a clear or obvious error occurred. *Id.* ¶ 15 (citing *Sebby*, 2017 IL 119445, ¶ 49).

¶ 80     Defendant did not object at trial or include this issue in a posttrial motion; he has therefore not preserved it for appellate review. *People v. Enoch,* 122 Ill. 2d 176, 186 (1988). Under the plain-error doctrine, a reviewing court will overlook a forfeiture where a clear, obvious error occurred and either (1) the evidence was closely balanced, or (2) the error was so grave that it impacted the fairness of the trial and denigrated the integrity of the judicial process. *People v. Sebby*, 2017 IL 119445, ¶¶ 48-49.

¶ 81     It is well-established that the State is afforded wide latitude in closing arguments. *Wheeler*, 226 Ill. 2d at 123. When reviewing closing arguments, we examine the arguments in their entirety and view allegedly improper remarks in context. *Id.* at 122. To that end, the prosecution is free to argue legitimate inferences drawn from the evidence. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). The prosecution is also permitted to respond to comments made by the defense. *People v. McGee*, 2015 IL App (1st) 130367, ¶ 56. Where the prosecutor's statements exceed the bounds of propriety, we will not disturb the fact finder's verdict unless the remarks resulted in substantial

prejudice, that is, the improper comments comprised a material factor in the defendant's conviction. *Wheeler*, 226 Ill. 2d at 123.

¶ 82    Defendant first contends that the prosecutor misstated the law in two instances during closing arguments, which effectively lowered the State's burden of proof. "A prosecutor may not misstate the law during closing arguments, as it can be grounds for reversal." *People v. Moody*, 2016 IL App (1st) 130071, ¶ 68. Defendant argues that the prosecutor misstated the element of "intent to kill" when the prosecutor argued, "When someone shoots at another human being they are shooting to kill. Guns kill." However, this argument accurately reflects the law as discussed, *supra*, that intent to kill may be inferred from firing a gun at another person. *Ephraim*, 323 Ill. App. 3d at 1110. Moreover, the prosecutor's argument must be viewed in their entirety. *Wheeler*, 226 Ill. 2d at 123. The prosecutor asserted that defendant's "actions" that day demonstrated his intent, emphasized the fact that guns are deadly weapons, and reviewed for the jury all of defendant's actions leading up to the shooting—placing a loaded gun in his pocket, then placing the loaded gun on his lap, then pointing it and shooting it at Alfonso—and asserted that all of these acts demonstrated his intent to kill. The prosecutor did not misstate the law or lower its burden of proof. Even so, "[a] misstatement of the law during closing argument does not normally constitute reversible error if the circuit court properly instructs the jury on the law." *People v. Lawler,* 142 Ill. 2d 548, 564 (1991). Here, the trial court's instruction on the law of intent would have cured any minor improper statement by the prosecution.

¶ 83    Defendant also takes issue with the prosecutor's comments regarding the concepts of self-defense and lawful justification, arguing that the prosecutor conflated the concepts of lawful possession of a firearm and justifiable use of force in discussing both the attempted murder and aggravated battery charges.

¶ 84    The prosecutor argued:

> "The third proposition is that the defendant did so without lawful justification. Osvaldo Colunga wasn't justified in carrying a gun outside of his house that day. He wasn't justified to hold it in his jeans pocket. He wasn't justified to put it on his lap. He certainly wasn't justified to put it in his hand. And he was not justified to point it in the direction of another human being and shoot it. Alfonso Delatorre testified that he was on the side of a road. He was on the side of 19th Avenue with his family. He had pulled over so he could get out of the car and stop at a friend's house when this defendant drove by and shot him. That is not lawful justification."

¶ 85    We find that the prosecutor did not misstate the law or conflate the concepts of lawful possession and justifiable use of force. As defendant observes, "[a] person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force." 720 ILCS 5/7-1(a) (West 2010). An individual may be justified in using force that is "intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." *Id.*

¶ 86    When viewed in full context, the prosecutor's comment focused on defendant's lack of justification in his use of force, that is, pointing the gun at Alfonso and shooting it, and not on defendant's mere lawful or unlawful possession of the gun. Defendant's actions demonstrated a certain amount of planning or premeditation that was out of proportion with what the circumstances called for that day—in carrying the gun with him most of the time, moving the gun onto his lap when he observed the vehicle of Latin Kings, and then pointing it out of the window

and shooting at the Buick. The prosecutor's surrounding comments demonstrate that this argument was also based on the evidence that Alfonso did not have a gun or point one at defendant and no gun was recovered from the Buick. In addition, any potential error was cured by the jury instructions regarding lawful justification. *Lawler,* 142 Ill. 2d at 564.

¶ 87    Defendant next contends that the prosecutor committed misconduct in arguing during opening close and in rebuttal that defendant "failed to take responsibility" for his actions and that the jury should take responsibility by convicting him. Defendant asserts that this denied him a fair trial because it called upon the jury to convict him because he failed to admit his guilt and save them the trouble of a trial. He argues that it was improper for the prosecutor to argue that defendant "failed to take responsibility" when speaking with police because he was not required to assert his defense or say anything to the police. Further, defendant argues that the State could not cross-examine defendant about his post-arrest failure to advance his defense because his statements were not manifestly inconsistent with his trial testimony. Defendant argues that the State exacerbated the problem by encouraging the jury to "send a message" to defendant by convicting him.

¶ 88    The State responds that when viewed as a whole, the prosecutor's opening-close asserted that defendant was responsible for his individual actions leading up to the shooting and the jury should convict defendant because the evidence regarding his actions established his guilt. Concerning rebuttal, the State argues that the prosecutor was responding to the defense's argument that Manuel and defendant were credible witnesses and focused on the evidence supporting the State's case and the inconsistencies in defendant's evidence, and did not assert that defendant should be held responsible because he chose to go to trial. The State asserts that the prosecutor asked the jury to find defendant guilty based on the evidence and his actions, and not to "send a message to defendant."

¶ 89    "Negative comments about a defendant's exercise of his or her constitutional rights are improper because they penalize the defendant for the exercise of those rights." *People v. Libberton*, 346 Ill. App. 3d 912, 923 (2003). However, a trial court can generally "correct any error by sustaining an objection and instructing the jury to disregard the remark." *Id.*

¶ 90    Here, the prosecutor extensively reviewed the trial evidence, including the testimonial evidence from the State's witnesses and the physical evidence presented, and reviewed the elements of the offenses and how that evidence established each element. The prosecutor argued that the evidence showed that defendant lacked legal justification for shooting at Alfonso and that defendant

> "was not justified in any of his actions that day. He wasn't justified in carrying the gun; he wasn't justified in holding the gun; and definitely and certainly was not justified in shooting the gun. Ladies and Gentlemen, [defendant] is responsible for carrying a gun on April 15, 2011; he is responsible for picking it up; he's responsible for pointing at Alfonso Delatorre; he responsible for shooting it; he responsible for that permanent disfigurement of his arm; and it's time that [defendant] took responsibility for his actions on April 15, 2011."

¶ 91    In closing, the defense asserted that defendant was a credible witness and reasonably feared for his life and the life of his brothers, and that the State's witnesses were "liars" and were lying about what occurred that day, including their claim that they did not have a gun that day. The defense asserted that defendant did not tell police about his lawful defense because poor prior interactions with the police and he remained silent after arrest.

¶ 92    In rebuttal, the State argued:

> "when you read each and every one of these instructions, you will not find a law that says this defendant, Osvaldo Colunga, can take a gun with him everywhere he goes for the next

ten months, from June all the way through the summer, through the winter into April, loaded, armed, ready to be shot at an individual who he thinks shot him. Ladies and Gentlemen, is not the law. That is called revenge. That is called retaliation. That's called not taking responsibility for your actions."

¶ 93　The prosecutor characterized defendant's testimony as a "spin of lies" and noted that after he was arrested, he was given his *Miranda* warnings and agreed to speak to the police and told them that he had been home all night watching a movie and ingesting marijuana, but did not tell police that he "was justified because ten months ago you guys knew that Alfonso shot me." The prosecutor continued:

"The creative testifying that you heard from the defendant is five years in the making. The evidence that the People have in this case is so overwhelming that he now has to come up with a reason as to why he shot him. Because he knows that he is guilty as the evidence points to him."

¶ 94　The State encouraged the jury to assess defendant's credibility as a witness and argued that he had a motive to testify untruthfully and Manuel's statement to police and testimony did not support defendant's theory of the case. The State reasoned that

"when you carry a gun and you follow behind another car and you raise that gun and you put seven pounds of pressure on that trigger and you propel that bullet out of that gun and shoot another individual, that is called attempt murder. *** Ladies and Gentlemen, the evidence is overwhelming that that is what the defendant did on April 15, 2011. For a year almost this defendant has been carrying a loaded gun in his pocket ***."

¶ 95　The prosecutor argued that defendant did not dispute that he had a gun and fired it, and the evidence showed that the bullet lodged in Alfonso's sleeve and was a match to the gun. The State

argued that defendant claimed he had lawful justification, but defendant could not carry a loaded gun for ten months and shoot at Alfonso simply because he knew him to be dangerous, and the evidence supported that he knew who was in the white Buick, he purposefully aimed and fired his gun instead of calling the police. Further, the State argued:

> "The defendant did not take responsibility when he spoke to the police. The defendant didn't take responsibility with that bogus lawful justification argument. The defendant did not take responsibility for any of his actions on April 15, 2011. Now, it's your opportunity to take responsibility to find the defendant guilty, guilty for his actions on April 15, 2011, by finding him guilty" of the charged offenses.

¶ 96    Viewing the State's arguments in their entirety and in light of the defense's closing, we find that the State did not improperly call upon the jury to convict defendant because he failed to admit his guilt and save the jury the trouble of a trial. Rather, the State's remarks asked the jury to hold defendant responsible for the charged offenses based on evidence of his actions. See, *contra*, *People v. Hawkins*, 284 Ill. App. 3d 1011, 1018 (1996) (Prosecutor's repeated references connecting defendant's failure to plead guilty to a failure to accept responsibility constituted error); Further, the State's comments also did not constitute an improper commentary on defendant's right to remain silent and failure to assert his defense. As previously discussed, defendant waived his right to remain silent after his arrest and spoke to the police, and the State properly used this as rebuttal evidence to impeach his trial testimony. See *People v. Thompson*, 2013 IL App (1st) 113105, ¶¶ 83-84 (reviewed in context, ASA's comments to jury that "the case was about 'accepting responsibility for your actions' and that [the] defendant was 'utterly unwilling to accept responsibility for his actions' " and "[t]ell him he's responsible for his actions," were not improper and "had no reference whatsoever to defendant's choice not to testify").

¶ 97    Moreover, the State did not improperly encourage the jury to "send a message" to the community at large by convicting defendant. Rather, the State properly urged the jury to hold defendant responsible for his actions. See *People v. Desantiago*, 365 Ill. App. 3d 855, 865 (2006) (Prosecutor's comment that the jury should send a message to defendant and it was time for him to take responsibility for what he did was not improper as it did not encourage jury to send a message to the community at large); *People v. Anderson*, 2017 IL App (1st) 122640, ¶¶ 115-116 (No unfair prejudice to the defendant when the State argued in rebuttal that a guilty verdict was the only way to make the defendant accept responsibility for what he did, where comments were invited by the defense closing).

¶ 98    Along similar lines, we also do not agree with defendant that the State's argument recited above improperly "mischaracterized his defense" by "falsely claiming Colunga had argued that he had the right to carry a gun around for a year and to fire it at Delatorre because he knew Delatorre was dangerous." The State's argument recognized that defendant conceded that he possessed the gun that day, and it did not assert that he should be found guilty merely because he possessed it illegally. Rather, the State's arguments were a fair response to defendant's evidence and lawful justification defense. The State's arguments disputed the precise issue defendant advocated, that is, that defendant knew Alfonso to be violent and that Alfonso was the initial aggressor on April 15, 2011. The State is "allowed a great deal of latitude in closing argument" and is permitted to respond to the defendant's closing argument in kind. *Figueroa*, 381 Ill. App. 3d at 849.

¶ 99    Because the State's remarks all fell within the bounds of propriety, no substantial prejudice to defendant or plain or obvious error occurred, and defendant's claim of prosecutorial misconduct must fail. Because we have found no prosecutorial error, we similarly find that defendant's trial counsel did not err in failing to object to the challenged comments, and defendant's claim of

ineffective assistance on that basis must also fail. *Banks*, 2016 IL App (1st) 131009, ¶ 123; *Strickland*, 466 U.S. at 687 (a defendant must satisfy both prongs of the *Strickland* test to prevail on a claim of ineffective assistance).

¶ 100                                    E. Ineffective Assistance

¶ 101  Defendant next asserts that his trial counsel was ineffective in failing to request an instruction on unreasonable self-defense concerning the attempted murder charge, which he contends he was entitled to under *People v. Lopez*, 166 Ill. 2d 441 (1995) and *People v. Reagan*, 99 Ill. 2d 238 (1983). Defendant argues that this court misread the legal principles set forth in *Logan* and *Reagan* in *People v. Guyton*, 2014 IL App (1st) 110450, ¶¶ 45-46, which held that a defendant acting in imperfect self-defense can still be convicted of attempted murder because the legislature has not created the offense of attempted second-degree murder, and urges this court not to follow *Guyton.*

¶ 102  As previously stated, to prevail on a claim of ineffective assistance of counsel, the defendant must show that his counsel's representation fell below an objective standard of reasonableness and that he was prejudiced as a result. *Banks,* 2016 IL App (1st) 131009, ¶ 123 (citing *Strickland,* 466 U.S. at 687-88). To establish deficient performance, a defendant must overcome the presumption that his counsel's actions constituted sound trial strategy. *Id.* To show prejudice, a defendant must show there is a reasonable probability that, but for counsel's insufficient performance, the result of the proceeding would have been different. *Id.* "Failure to make the requisite showing of either deficient performance or sufficient prejudice defeats the claim." *Id.*

¶ 103  Generally, an attorney's choice of jury instructions is a matter relegated to trial strategy. *People v. Sims,* 374 Ill. App. 3d 231, 267 (2007). As such, counsel's decisions regarding jury

instructions "enjoy a strong presumption that they reflect sound trial strategy rather than incompetence," and are "generally immune from claims of ineffective assistance of counsel." *People v. Enis,* 194 Ill. 2d 361, 378 (2000).

¶ 104    The offense of attempted (first degree) murder requires "the specific intent to kill someone. [Citations.] Mere intent to do great bodily harm, or even knowledge that one's acts may result in great bodily harm or death, is insufficient." *People v. Cunningham*, 376 Ill. App. 3d 298, 303 (2007). "A person commits the offense of attempt when, with intent to commit a specific offense, he or she does any act that constitutes a substantial step toward the commission of that offense." 720 ILCS 5/8-4 (West 2010). In turn, a defendant commits first degree murder when he kills another without lawful justification and:

"in performing the acts which cause the death:

(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9-1 (West 2010).

¶ 105    A reasonable belief in the need for self-defense constitutes a defense to a charge of first degree murder. That is, an individual is "justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1 (West 2010).

¶ 106    Defendant argues that his attorney should have requested an instruction on *unreasonable* self-defense to the attempted murder charge because the jury could have found that he did not have the intent to unlawfully kill or cause great bodily harm to Alfonso or the other occupants of the

- 40 -

Buick because he had an unreasonable belief in the need to use deadly force in self-defense (or to defend his brothers). He contends that because the legislature allows for mitigation from a first degree murder charge to a second degree murder charge where there is evidence of an unreasonable belief in the need to use deadly force in self-defense (720 ILCS 5/9-2(a)(2), (c) (West 2010)),[3] he should be allowed to mitigate attempted (first degree) murder to attempted (second degree) murder, although Illinois does not recognize the offense of attempted (second degree) murder.

¶ 107   This court recently addressed the issue of unreasonable belief in the need for self-defense in the attempted murder context in *Guyton*, 2014 IL App (1st) 110450. In *Guyton*, the defendant was charged with first degree murder for killing one victim and attempted murder for shooting another victim, and he raised his unreasonable belief in the need for deadly force as a defense at trial. *Id.* ¶¶ 39-40. He was convicted of second degree murder and attempt (first degree) murder; on appeal, the defendant argued that because he fired simultaneously at the two victims, it was unreasonable to find that he did not have an unreasonable belief in his need for deadly force in self-defense against the victim he did not kill. *Id.* However, the court found that imperfect self-defense is not a defense to attempted (first degree) murder because no such crime as attempted (second degree) murder exists. *Id.* ¶ 46.

¶ 108   Defendant claims this court's *Guyton* decision is inconsistent with supreme court precedent in *Reagan* and *Lopez*. In *Reagan*, our supreme court held that Illinois does not recognize the crime of attempted voluntary manslaughter as a defendant "would have to specifically intend to kill with

---

[3] An individual commits second degree murder where he commits the offense of first degree murder and one of two mitigating factors is present, that is, "at the time of the killing he or she believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his or her belief is unreasonable." 720 ILCS 5/9-2(a)(2) (West 2010).

an unreasonable belief in the need to use deadly force in self-defense," but it is "impossible to intend an unreasonable belief." *Reagan*, 99 Ill. 2d at 240.

¶ 109   The court reaffirmed this holding in *Lopez*, where it held that the offense of attempted (second degree) murder did not exist in Illinois because a defendant cannot have the specific intent to commit second degree murder, *i.e.*, the intent to kill without lawful justification and the intent to have a mitigating circumstance be present (such as sudden and intense passion due to serious provocation or the unreasonable belief in the need to use deadly force). *Lopez*, 166 Ill. 2d at 448-49. The court observed that, as to imperfect self-defense, "one cannot intend to unlawfully kill while at the same time intending to justifiably use deadly force." *Id.*

¶ 110   We decline defendant's invitation not to follow *Guyton* as we believe it is consistent with our supreme court's holdings in *Reagan* and *Lopez.* As the *Guyton* court observed, the legislature has not amended the attempt statute, despite the passage of decades since *Lopez* and *Reagan,* in order to allow for a defense of imperfect self-defense in mitigation, or created the crime of attempted (second degree) murder. This is compelling especially considering that the legislature amended the attempted murder statute to allow a defendant to prove at sentencing that the mitigating factor of provocation was present to reduce the class of the offense. *Guyton*, 2014 IL App (1st) 110450, ¶ 44 (citing 720 ILCS 5/8-4(c)(1)(E) (West 2010)). Accordingly, counsel's decision not to request an instruction on unreasonable belief in self-defense was not deficient because there was no basis in the law to request such an instruction. Counsel's failure to request this instruction did not cause defendant any prejudice.

¶ 111                               F. Sentencing

¶ 112   In his next issue on appeal, defendant contends that this court should reduce his sentence for attempted murder because the State failed to prove that he caused permanent disfigurement to

Alfonso, which subjected defendant to a 25-year enhancement. Defendant argues that the court should vacate the 25-year enhancement and sentence him to a 20-year enhancement for discharging a firearm with no finding of any permanent disfigurement. Defendant also argues that his sentence was excessive because it did not adequately consider mitigating evidence such as his age and the fact that he was diagnosed with schizophrenia in the years following the shooting.

¶ 113  "It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Consequently, we may review defendant's claims of error only if he establishes plain error, that is, defendant bears the burden of showing that a clear or obvious error occurred and that either "(1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Id.* at 545.

¶ 114  "The trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). We review a sentence within the statutory limits for an abuse of discretion. *Id.*  "A sentence will be deemed an abuse of discretion where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted). *Id.* We give great deference to the trial court's sentencing determination because it was in a superior position to observe the defendant and proceedings first-hand. *Id.* at 212-13. The trial judge has a superior opportunity to evaluate and weigh such factors as a defendant's credibility, demeanor, character, moral capacity, social environment, age, and habits. *Id.* at 213. We will not substitute our judgment for that of the trial court merely because we would have weighed various factors differently. *Id.* Absent some affirmative indication otherwise, we presume that the trial judge considered all mitigating factors in the record. *People v. Perkins*, 408 Ill. App. 3d 752, 762-

63 (2011). The court is not required to give mitigating factors greater weight. *Alexander*, 239 Ill. 2d at 214.

¶ 115 Here, the State charged defendant with attempted murder alleging that he personally discharged a firearm which caused permanent disfigurement to Alfonso. Attempted murder with a finding that a defendant personally discharged a firearm causing permanent disfigurement requires a 25-year sentencing enhancement. 720 ILCS 5/8-4(c)(1)(D) (2010). Attempted murder which entails the discharge of a firearm but without any finding of permanent disfigurement calls for a 20-year add-on sentencing penalty. 720 ILCS 5/8-4(c)(1)(C) (2010). Defendant's jury specifically determined that in committing attempted murder, defendant discharged a firearm and, in doing so, caused permanent disfigurement to Alfonso. On appeal, defendant asserts that there was insufficient evidence to prove beyond a reasonable doubt that the gunshot wound caused permanent disfigurement to Alfonso's arm, and this court should therefore find the evidence was insufficient as to this aggravating factor and reduce the add-on penalty to only 20 years for discharging a firearm.

¶ 116 "Whether defendant has inflicted great bodily harm or permanent disfigurement is generally a question of fact." *People v. Doran*, 256 Ill. App. 3d 131, 136 (1993). "According to Black's Legal Dictionary, disfigurement is that which 'impairs or injures the beauty, symmetry, or appearance of a person or thing; that which renders unsightly, misshapen, or imperfect, or deforms in some manner.' " *People v. Woods*, 173 Ill. App. 3d 244, 249 (1988) (Black's Law Dictionary 420 (5th ed. 1979)).

¶ 117 Viewing the evidence in the light most favorable to the State and deferring to the jury's assessment of the evidence presented and what inferences to draw from this evidence, we find there was sufficient evidence of permanent disfigurement such that we decline to overturn the

jury's determination. *Jackson*, 443 U.S. at 319; *Wheeler*, 226 Ill. 2d at 114. The jury was presented with evidence of permanent disfigurement in the form of testimony by Alfonso and the responding police officer who observed the gunshot wound immediately after the incident. It was not disputed that the bullet fired by defendant traversed the metal car door and pierced and penetrated Alfonso's arm and exited out the other side and lodged in his jacket. The bullet caused a visible, bleeding hole that required prompt medical attention at the hospital. The jury was also presented with photographic exhibits of the injury in making its determination. We decline to second-guess the jury's determination on this factual issue. *Doran*, 256 Ill. App. 3d at 136. Based on the record, we cannot say that defendant has shown that this evidence was so "unreasonable, improbable, or unsatisfactory" that is raised a reasonable doubt about his guilt. *Scott*, 2020 IL App (1st) 180200, ¶ 39. Our courts have repeatedly held that determinations such as permanent disfigurement or great bodily harm are factual questions belonging to the province of the trier of fact. *Doran*, 256 Ill. App. 3d at 136. See *People v. Newton,* 7 Ill. App. 3d 445, 447 (1972) (sufficient evidence that victim suffered permanent disfigurement or great bodily harm where the victim received six stitches for a head wound and testified at trial five months later that there was a small scar covered by hair); *Doran*, 256 Ill. App. 3d at 132-33 (sufficient evidence of permanent disfigurement where the record contained pictures of the victim's injuries and the victim displayed a scar in the bridge area of his forehead). In so holding, we are mindful that it is not the function of this court to retry defendant on appeal or substitute our judgment for that of the jury. *People v. Collins,* 214 Ill. 2d 206, 217 (2005).

¶ 118   In defendant's next claim of sentencing error, he contends that the trial court did not adequately consider evidence in mitigation. Attempted murder is a Class X offense carrying a sentencing range of 6 to 30 years in prison. 720 ILCS 5/8-1(c)(1) (West 2010); 730 ILCS 5/5-4.5-

25(a) (West 2010). Defendant's sentence of 10 years (not including the 25-year gun enhancement) was at the low end of this range. However, defendant argues that the trial court should have sentenced him to the very minimum of his range, 6 years' imprisonment, in light of the mitigating evidence.

¶ 119   He argues that his young age (20 years old) at the time of the shooting warranted a lower sentence, citing the reasoning in *Miller v. Alabama*, 567 U.S. 460, 471-72 (2012), that juveniles should be treated differently than adults for sentencing purposes as their "distinctive attributes" such as "transient rashness, a proclivity for risk, and an inability to access consequences" correspondingly "diminish the penological justifications for imposing the harshest sentences on juvenile offenders."

¶ 120   We find defendant's citation to *Miller* unavailing as that case stands for the principle that a mandatory life or *de facto* life sentencing scheme is unconstitutional in relation to juveniles as it prevents courts from considering individual circumstances of a juvenile. *Miller*, 567 U.S. at 479. In addition to the fact that defendant was not a juvenile, he also was not facing a mandatory or *de facto* life sentence. The trial court here was free to exercise its discretion in selecting its sentence within the applicable range and consider defendant's age and attendance rehabilitative potential. Indeed, it is notable that in sentencing defendant to 10 years' imprisonment, the trial court sentenced defendant to the lower end of the applicable sentencing range—within 4 years of the minimum allowed sentence, and 20 years less than the maximum possible sentence. Moreover, the record supports that the trial court thoroughly considered all of the relevant sentencing factors, including defendant's age, along with the nature of the offenses, defendant's criminal and social history, educational and employment background, family history, and observed his demeanor and mentality at trial and during sentencing. Defendant had a prior conviction for aggravated robbery

(2007), two battery convictions (2008), domestic battery (2010), and a probation violation. The trial court had before it the presentence investigation report detailing this information along with the evidence and arguments submitted by the parties at sentencing and trial. The trial court was in a superior position to evaluate the impact of defendant's age and weigh this factor among the other factors in fashioning his sentence, and defendant has not established that its decision was at great variance with the spirit and purpose of the law or manifestly disproportionate to the nature of his offense. *Alexander*, 239 Ill. 2d at 212-13.

¶ 121   Additionally, defendant asserts that the trial court inadequately considered the fact that he was diagnosed with schizophrenia two years after the shooting and he likely was suffering from this condition at the time of the shooting. We similarly find no abuse of discretion in the trial court's sentence as it relates to defendant's mental health issues. *Alexander*, 239 Ill. 2d at 212. The record reflects that this issue was explored in depth during the sentencing hearing. The trial court was presented with defendant's mental health history and reports. Defendant's presentence investigative report showed that he was diagnosed with bipolar disorder and schizophrenia in 2013, which led to a brief hospitalization and then treatment at a mental health center. He required medication to treat his mental health conditions. Defendant's counsel argued at length regarding defendant's mental health diagnosis and defendant testified concerning his mental health history. Although defense counsel used the mental health information to argue that defendant should be sentenced to a Class 1 felony instead of a Class X felony because he was acting in a sudden and intense passion resulting from serious provocation, the trial court was nevertheless presented with this information to consider in determining defendant's ultimate sentence as a Class X offender. After considering all of this evidence, the trial court ultimately determined that it was speculative that defendant was suffering from a mental condition in April 2011. The trial court observed that

all of defendant's records were dated two years after the shooting and there was no indication in the records that defendant "was acting under any psychosis or mental defect" at the time of the incident.

¶ 122   Accordingly, on the record, defendant has not provided any affirmative indication that the trial court failed to consider all mitigating factors, including his age and mental health conditions. *Perkins*, 408 Ill. App. 3d at 762-63. The trial court, however, was not required to give these mitigating factors greater weight than the factors in aggravation, such as defendant's criminal history and the facts of the shooting. *Alexander*, 239 Ill. 2d at 214. We therefore find the trial court did not abuse its discretion in determining defendant's sentence. *Id.* at 212. Defendant has also failed to show that any clear or obvious error occurred with regarding to his sentencing. *Hillier*, 237 Ill. 2d at 544. Because no error occurred, defendant's alternative claim that his counsel rendered ineffective assistance in failing to file a motion to preserve his sentencing issues for appeal must likewise fail. *People v. Givens*, 237 Ill. 2d 311, 331 (2010) (failure to file a futile motion does not establish ineffective assistance of counsel).

¶ 123                                 G. Mittimus

¶ 124   In his final argument, defendant asserts that this court should amend his mittimus to reflect the correct number of days that he spent in presentence custody. We observe that while this appeal was pending, our supreme court adopted and then amended a new Illinois Supreme Court Rule 472 regarding the procedure in criminal cases for correcting sentencing errors such as calculation of presentence custody credit. Ill. S. Ct. R. 472(a)(3) (eff. May 17, 2019). The rule provides that "[n]o appeal may be taken" on the ground of any of the sentencing errors enumerated in the rule unless that alleged error "has first been raised in the circuit court." Ill. S. Ct. R. 472(c) (eff. May 17, 2019). Further, "[i]n all criminal cases pending on appeal as of March 1, 2019, or appeals filed

thereafter in which a party has attempted to raise sentencing errors covered by this rule for the first time on appeal, the reviewing court shall remand to the circuit court to allow the party to file a motion pursuant to this rule." Ill. S. Ct. R. 472(e) (eff. May 17, 2019). Accordingly, pursuant to Rule 472, we remand to the circuit court to allow defendant to file a motion regarding his presentence custody credit issue.

¶ 125                              III. CONCLUSION

¶ 126   For the foregoing reasons, we affirm the judgment of the circuit court of Cook County, but remand as to the issue of presentence custody credit.

¶ 127   Affirmed; remanded as to presentence custody credit.